[S. F. No. 16754.   In Bank.   Oct. 30, 1942.]

DAN DEEVY et al., Respondents, v. J. A. TASSI et al., Appellants.

George T. Davis for Appellants.

Vincent W. Hallinan and James A. Himmel for Respondents.

SCHAUER, J. pro tem.—Defendants appeal from a judgment entered pursuant to jury verdicts in favor of the several plaintiffs in an action for damages for malicious assault and battery. Each plaintiff was awarded both compensatory and exemplary damages against both defendants. Arguments are advanced to the effect that the evidence is insufficient to support any of the verdicts, that plaintiffs' counsel was guilty of prejudicial misconduct at the trial, and that the court erred in instructing the jury and in various rulings on questions of law. We find nothing in the record which requires a new trial but the judgment must be modified by striking out the award of punitive damages as against the defendant J. A. Tassi, who was the employer of the other defendant but who is not shown to have personally participated in, directed, or ratified the acts of violence which were committed.

### Dramatis Personae

The principal characters participating in the rural life drama depicted in the evidence include the plaintiffs Dan Deevy, who was a dairy-farmer, fifty-five years of age, suffering from chronic miocarditis; his wife Nellie, of approximately the same age; and their twenty-year-old daughter Julia. An older brother of Julia, Dan Deevy, Jr., also played a part, and a hired hand of the Deevys is mentioned in a minor capacity. The defendants are Emmet A. Tassi, the managing agent of the San Jose Cow Market, a fictitious name enterprise; and J. A. Tassi, the owner of such enterprise and father of Emmet. Of the defendants, only Emmet appears in an active role. Associated with him, however, in almost equal prominence in the activities, was one Sam Howe, a 180-pound professional rodeo rider and steer bulldogger, who liked wine with his meals. In a semi-neutral but active capacity was one Jack Bones, a constable and special deputy sheriff, whose compensation for the day was provided by the Tassis but who was directed by his chief, the sheriff, to attempt to preserve peace. Other persons whose names appear materially in the evidence as employees or helpers of defendants but who took little or no active part in the actual dragooning hereinafter depicted, were Ralph Kynock, his uncle Dave Kynock, and Lawrence Mackin.

### Basic Facts

On Saturday, March 30, 1940, the daughter Julia Deevy and her brother Dan, Jr., were the owners of a 1,421-acre

cattle ranch in Marin County. On that ranch were forty-seven cows owned by Dan, Jr., and approximately eighty other cattle owned by his father and mother.

The trouble arose when, on the day mentioned, Emmet A. Tassi, hereinafter referred to as Tassi, came to the Deevy ranch with several helpers, including Bones, the two Kynocks, and Mackin, and endeavored to take possession of and remove substantially all the cattle on the ranch. He claimed right of entry on the premises and right of possession of the cattle on the basis of a chattel mortgage theretofore executed by Dan Deevy, Sr., and Nellie Deevy.

The mortgage was given by the senior Deevys in the year 1937 when they purchased fifty-two cows from the San Jose Cow Market through Tassi, acting as manager. The transaction was on a credit basis. The fifty-two head of cattle were billed at $6,065. Interest, computed at 4 per cent in advance, sales tax, and fees, brought the total charge to $6,503.06, for which a promissory note and the mortgage were executed. The note called for additional interest at 8 per cent on deferred payments and provided for 12 per cent per annum interest, payable monthly, on sums paid after maturity. The fifty-two head of cattle so purchased were hypothecated as security and in addition the mortgage purported to impose its lien on thirty-eight other cattle which were then owned in whole or in part by the senior Deevys and a Mr. and Mrs. Gomez who joined in the note and mortgage. In the description of property mortgaged there was a further provision reading, "Also all of the heifer increase from the above animals." The default clause provided that "if there should be any default . . . or in event of an unreasonable depreciation in value of the mortgaged property or the mortgaged property from any other cause reasonably shall be deemed, by the mortgagee . . . inadequate security . . . then . . . the mortgagee or his assigns thereupon or at any time during such default shall have the right to take possession of any and/or all of the mortgaged property wherever the same may be, and for that purpose may enter into and upon any premises whatever or wherever the mortgaged property or any part thereof may be or may be supposed to be, either with or without process of law and using all necessary force so to do, and if found shall have the right to take possession of and/or remove the same or any part thereof. . . ." It was under this latter clause that Tassi

asserted the right to take possession of the cattle on March 30, 1940.

The exact amount claimed to be due on that date does not clearly appear, nor is it material except as it throws light on the relationship and intentions of the parties, but a statement rendered in the name of the San Jose Cow Market, dated April 17, 1939, asserts total charges of $7,212.54, payments aggregating $3,254.48, and a balance owing of $3,958.06. On March 30, 1940, according to his testimony at the trial, Tassi claimed that the Deevys (Dan, Sr., and Nellie) were in default in not having paid more than $3,254.48 on account for the fifty-two cattle he had sold, that the security had depreciated in value, that there was or should have been an augmentation of the cattle originally hypothecated to the extent of fifty heifers under the "heifer increase" clause, and that he was entitled to take possession of approximately 136 cattle. The Deevys disputed the account. On the date involved (March 30, 1940) when Tassi claimed the cattle, they denied that they owed anything and asserted that Tassi had no right to any of the cattle. However, there was then pending in the Superior Court of Marin County an action for accounting and for declaratory relief, brought by Nellie Deevy, Dan Deevy, Jr., and Julia Deevy, against various defendants, including E. A. Tassi, in which, among other averments, was the following: "that the total present amount due upon the aforesaid contract [the contract for the purchase of the 52 cows] is the sum of $2000.00; that plaintiff Nellie Deevy has at all times been, and is now ready, able and willing to pay such sum of $2000.00, or such other amount as may be actually due and payable to said defendant Tassi." Although the copy of the note set forth in the mortgage purported to be payable in installments but fixed no times or amounts of payments, the original note appears to have called for payments of $541.92 monthly, commencing February 15, 1938. Whatever the fact in regard to payments due, we shall assume, for the purposes of this opinion, that the senior Deevys were in default on the date in question.

### Preliminary Skirmish

The day was stormy with heavy rain. Tassi, the two Kynocks, Mackin, and Bones, arrived at the Deevy ranch shortly after noon. With them, in a truck, they brought two saddled horses. Tassi and Bones told Mr. and Mrs. Deevy that

they had come to take the cattle. The Deevys replied, in substance, that they owed nothing, that Tassi had no right to the cattle without a court order, and that they would not permit the cattle to be removed without such court order. Tassi did not have "a court order" but said, "I am going to take the cattle." Then he and the younger Kynock mounted horses and endeavored to round up the cattle. Mr. and Mrs. Deevy stood against a near-by gate leading to the pasture and thus prevented Tassi and his helper from entering at that point. The latter two, however, proceeded along the fence and gained access through another gate. They drove about sixty head of cattle down to the vicinity of the barn, near the driveway to the county road. At this juncture the Kynocks decided that they would take no further part in the proceedings and Tassi left to get more help. He returned in about one hour with Sam Howe. In the meantime Mrs. Deevy and Dan, Jr., had departed to seek the aid of the local justice of the peace, leaving Mr. Deevy and the girl Julia alone to protect the property. Also during Tassi's absence about sixty milking cows had been placed in stalls in the dairy barn, a modern building with concrete floors and mangers and wooden stall stanchions. A substantial number of the cows were not subject to the Tassi mortgage. Resting on a ledge in the dairy barn, in its customary place, was a .22 calibre rifle, owned by Dan Deevy, Jr.

Mackin had remained on the premises, in defiance of an order by Mr. Deevy to leave, and when Tassi returned with Howe the three of them proceeded directly in an effort to carry out their purpose. It developed at the trial that Howe had been told by Tassi that the latter had a court order for the cattle and, apparently fortified by belief in that statement, as well as by "two or three" glasses of wine which he said he had had, he proved to be an active, if not a wise, assistant.

### Assault and Battery

As Tassi and Howe approached the barn Tassi was carrying a redwood fence picket about five feet long and two inches square. Deevy, Sr., stepped into the barn ahead of them. In the barn he picked up a willow stick or cane about one-half inch in diameter and weighing about one-half pound. He stepped in front of Tassi and "told him he would not take those cows out and he said—he said if you don't keep out of my way I will murder you." Deevy did not raise his stick

or make a threatening motion with it at any time except once as related later herein. Tassi, untouched physically, simply walked past Deevy and started releasing the cows on the farther side of the barn. Howe, who had no stick, started the same procedure at his side of the barn. Deevy, using his hands and not the stick, endeavored to push Howe away from the stanchions. The latter then struck Deevy a blow with his fist, on the side of the head, knocking him down on the concrete floor, dazing him, and breaking his glasses. Howe then stepped to the near-by wall of the barn and picked up the rifle. In the meantime Tassi rushed up and as Deevy was arising Tassi struck him with the fence picket across the back of the head. Julia Deevy had come to the door and saw Howe with the gun pointing it at her father. She "dived" at Howe and in the struggle for the gun, which was a loaded automatic, it fell on the concrete and one shell fired. Howe held the girl and struck her with his fist. She struggled to escape his clutch and screamed for help, turning toward Tassi. He responded by striking her on the jaw with his fist, a blow which stunned her momentarily. By this blow (or some other or others during the encounter) her jaw was apparently dislocated (as she described it: "My face was to one side. . . . My jaw was right over to the side; I could not get it back") and two teeth were broken. When she recovered consciousness she saw that Tassi had picked up the rifle and was pointing it at her. At about this stage in the melee, Bones, the deputy sheriff, who had been near enough to hear the gun shot and Julia's screams, appeared in the scene. He demanded the gun from Tassi in the name of the law. Tassi replied that he had no respect for the law and refused to surrender it. Bones wrested it from him. He then heard Julia scream again and saw "Sam Howe was striking the girl." He caught Howe with a jiu jitsu hold and forced him to release Julia. He saw Howe strike Julia once. Both Tassi and Howe swore at the girl. Julia saw Howe "twirling around again," and said, "You are drunk; please get out of this barn." He denied the accusation but grabbed her again and threw her against a stanchion. Both her father and Bones now attempted to help her escape from Howe. On this one occasion Deevy used his stick. He "made a clout" at Howe. But unfortunately for the gallant Bones, Mr. Deevy's glasses were broken and his target was a moving one. When the blow fell it was Bones, not Howe, who was in range.

Julia was released by Howe, but she was not through. Again she turned to Tassi and (in her own language) asked him "please to get out, he had done enough trouble. He didn't say anything, but swung around with the picket and hit me full against the chest."

Tassi and his helpers succeeded in releasing all the cows in the barn and, with the other cattle which had been rounded up, they drove out onto the county road, adjacent to the Deevy ranch, a herd numbering according to various witnesses for plaintiffs, from 115 to 132 head. Forty-seven of them were owned by Dan, Jr., and were not subject to the mortgage. The Deevys, however, had not yet surrendered possession. Braving threats by Tassi to Deevy that "If you come down after me to stop me from taking those cows I will murder you. . . . I will murder you with this picket. I will split your skull with it," Mr. Deevy, Julia, and a hired hand stayed with the herd, endeavoring to turn it back. While still adjacent to the ranch they met Mrs. Deevy and Dan, Jr., returning home. With the latter's assistance the tide of battle soon turned, but not before the bulldogger Howe had again figured prominently.

### Final Engagement

Mrs. Deevy, Julia, Mr. Deevy, and Dan, Jr., faced the oncoming herd of 115 or more cattle to turn them back. The road was cut into the side of a hill. Mrs. Deevy was at the outer edge of the embankment. Howe came riding through or around the herd, and struck Mrs. Deevy across the head and shoulders with an eight-foot lash, described as a "bull-whip," made of plaited leather. He rode his horse against and over her, knocking her down the embankment. She rolled about twenty feet, striking two tree stumps, and coming to rest against a fence which prevented her rolling about 150 feet farther down the hill. Dazed or unconscious, she was carried up the bank by Mr. Deevy, Dan, and Julia, placed in an automobile, and taken home. In the meantime Dan, Jr., had had a short but decisive meeting with Tassi. The latter was swinging an eight-foot post as Dan approached—but the weapon was unwieldy. Dan reached close quarters and Mr. Tassi announced that he was ready to go home without the cows. Mr. Howe came to the same conclusion. Father and son drove their cattle home. The milking was resumed.

## Physical Injuries

A doctor, whom the plaintiffs tried to see on the day of the assaults and who did examine them on the following day, added little by way of description of their injuries. He found that Mr. Deevy's heart evidenced "nervous augmentation" of the chronic miocarditis. His heart "was a little more rapid than usual." He said that, as a general thing, it was harmful or dangerous for a person suffering from chronic miocarditis to be engaged in any kind of physical exertion or altercation. He had previously prescribed bed-rest and digitalis as treatment for the condition and had warned of the possible consequences of any over-exertion. All three of the plaintiffs complained of traumatic injuries and pain. The doctor observed evidences of the same but discovered no fractures or dislocations. Mr. Deevy testified that his jaw was sore "for a month or six weeks," that his heart was weaker, that he had pain in his side, and that he had "never been well since." Mrs. Deevy, in addition to describing extensive bruises and some abrasions, said that she had not been without a headache after the battery upon her and up to the time of trial. Julia, prior to the trial, had had one of her broken teeth extracted. The other, which had been chipped, had been neither extracted nor repaired. The pain in her jaw had continued for at least seven months.

While there was substantial conflict on a number of factual issues the jury must be presumed to have resolved all such issues in favor of plaintiffs. The evidence is adequate to establish the facts related above.

## Law Points

The assumed fact that Mr. and Mrs. Deevy were in default under the terms of the chattel mortgage and that Tassi had a legal right to acquire possession of some or even all of the cattle he attempted to take, does not justify the commission of assault and battery in effecting recaption. Admittedly the Deevys' possession had been lawfully acquired. The rule is stated by the American Law Institute in Restatement of the Law (Torts, § 108, p. 240) as follows: "The use of force against another for the purpose of recaption of a chattel, which the other is tortiously withholding from the actor, is not privileged if the other's possession was rightfully acquired." The comment, on the same page, is: "An invasion of another's interests of personality for the purpose of regaining a chattel, the possession of which the other has rightfully acquired, is

not privileged. This is so although the other's right to possession has ceased and he is therefore a wrongdoer in refusing to give the chattel up to the actor, who is entitled to the possession thereof. Thus, if the actor has bailed his chattel to the other, he is not privileged to use force to retake it, even though the bailment is at an end and the bailee's retention of it is a conversion.''

This court followed that rule in *Silverstin* v. *Kohler & Chase,* (1919) 181 Cal. 51, 54 [183 P. 451, 9 A.L.R. 1177]. Substantially the same rule is declared to be ''the great weight of authority'' in the annotation at page 1180 of 9 A.L.R., and it is stated in 4 Am. Jur., Assault and Battery, section 80, page 170. The Supreme Court of Iowa, in *Biggs* v. *Seufferlein,* (1914) 164 Iowa 241 [145 N.W. 507, L.R.A. 1915F 673 at 679], expressed it thus: ''It is well settled that the mere right to the possession of property does not entitle the party to take the same from the one in the actual rightful possession by force or violence. But to recover possession, under such circumstances, resort must be had to legal proceedings.''

The assaults and batteries upon plaintiffs Dan Deevy and Julia Deevy were perpetrated while the cattle were still in the Deevy barn and clearly were in their possession. ■ The attack on Mrs. Nellie Deevy took place on the county road adjacent to the Deevy property while the struggle for control and possession of the cattle was still in progress. The jury was justified in finding that the Deevys had not relinquished or been deprived of possession at that time but even if we should assume that they had been dispossessed and that Tassi had acquired possession, the judgment must nevertheless stand. The quantity and character of force used by the 180-pound mounted bulldogger in striking the fifty-five-year-old woman across the head and shoulders with the eight-foot plaited leather lash and in riding the horse against and over her was shockingly out of proportion to that which would have been reasonably necessary to offset or interrupt her efforts to control the herd of cattle. The rule in such a case is stated in Restatement of the Law (Torts, § 81, p. 187) in these words: ''The actor is not privileged to use any means of defending his land or chattels from intrusion which are intended or likely to cause bodily harm or confinement in excess of that which the actor correctly or reasonably believes to be necessary to prevent or terminate the other's intrusion.'' There is

no contention by defendants that they reasonably believed it to be necessary, in the premises, to lash Mrs. Deevy or run her over with the horse. The rule stated above conforms to that which has been followed in California. (*McLean* v. *Colf*, (1918) 179 Cal. 237, 238 [176 P. 169].)

Defendants attack the sufficiency of the evidence to sustain the amounts of compensatory damages awarded each plaintiff; i.e., $2,500. There is no merit in this contention. Again turning to the work of the American Law Institute (Restatement of the Law, Damages, § 905, p. 543) we find the following statement: ''Compensatory damages for harm not involving pecuniary loss include compensation (a) for bodily harm, and (b) for emotional distress.'' In commenting on clause (b) the institute says: ''The principal element of damages in actions for battery, assault or false imprisonment, as well as in actions for defamation, malicious prosecution and alienation of affections, is frequently the disagreeable emotion experienced by the plaintiff. . . . A person who has a cause of action for a tort may be entitled to recover as an element of damages for that form of mental distress known as humiliation. . . . This state of mind may result from a physical harm . . . or even the destruction or dispossession of chattels. . . . As an element of damages for a tort, a person may be entitled to recover for a feeling of anxiety, not only for himself but for others, if this is the expectable result of the defendant's tortious act or if the defendant intended such result. . . . In some cases fear and anxiety alone are a sufficient basis for the action, as where the defendant has assaulted the plaintiff.''

In California the law is settled that mental suffering constitutes an aggravation of damages when it naturally ensues from the act complained of (*Sloane* v. *Southern California Ry. Co.*, (1896) 111 Cal. 668, 680 [44 P. 320, 32 A.L.R. 193]) and in this connection mental suffering includes fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation and indignity, as well as physical pain (8 Cal.Jur. pp. 771, 772, § 34).

An appellate court should not assume to substitute its appraisal, for that of a jury, of the amount of damages for physical pain and mental suffering sustained by a party in a case where trial by jury was had as a matter of right (see Code Civ. Proc., § 956a), but in a case where it appears that a verdict is so grossly disproportionate to any reasonable limit of compensation warranted by the facts as to shock the sense

of justice and raise at once a strong presumption that it is based on prejudice or passion rather than sober judgment (see *Ware* v. *McPherson*, (1931) 213 Cal. 120, 121 [1 P.2d 433]; *Hart* v. *Farris*, (1933) 218 Cal. 69, 77 [21 P.2d 432]) the appellate court may reverse the judgment and remand the case for a new trial either on all the issues or on the issue of damages alone (see *Bellman* v. *San Francisco H. S. Dist.*, (1938) 11 Cal.2d 576, 588 [81 P.2d 894]; *Pretzer* v. *California Transit Co.*, (1930) 211 Cal. 202, 209 [294 P. 382]; *Moeller* v. *Market St. Ry. Co.*, (1938) 27 Cal.App.2d 562, 570 [81 P.2d 475]), or it may, in the interests of justice and with the consent of the party against whom the modification is made, modify the judgment as to the amount of damages, and affirm it as modified (see *Simoneau* v. *Pacific Electric Ry. Co.*, (1913) 166 Cal. 264, 277 [136 P. 544, 49 L.R.A.N.S. 737]; *Lightner Mining Co.* v. *Lane*, (1911) 161 Cal. 689, 709 [120 P. 771, Ann. Cas. 1913C, 1093]; *Salstrom* v. *Orleans Bar Gold Min. Co.*, (1908) 153 Cal. 551, 559 [96 P. 292]). But here we have no such verdict as shocks the sense of justice or raises a presumption that it was based on prejudice or passion. The fact that the punitive damages were limited to the moderate amount of $500 in each case suggests that the jurors were careful and conservative in their deliberations. Certainly in the cloistered detachment of our chambers, without view of the parties or their witnesses and in the absence of awards obviously disproportionate to the facts, we should not assume that we are better equipped than were the citizen-jurors of Marin County to appraise all those elements of damages entering into the case, the principal of which are essentially dependent to a material degree on manifestations of the parties concerned.

Furthermore, defendants' contentions on this subject were considered by the trial judge on their motion for a new trial. As was said in *Willoughby* v. *Zylstra*, (1935) 5 Cal.App.2d 297, [42 P.2d 685], at page 302, "The fact that the trial court denied a motion for new trial on the ground of excessive damages, among others, is persuasive and confirms us in our conclusion from a review of the record that the verdicts herein may not be declared excessive."

In connection with their contention that the verdicts were excessive defendants complain of asserted misconduct on the part of plaintiffs' counsel in his opening statement, in questions asked of witnesses and in argument

to the jury, tending to incite the jurors to passion and prejudice. It does not appear that the jurors were so incited. Counsel referred to defendant Tassi and his helpers as a "gang of desperadoes." He said Tassi "showed himself to be a racketeer." He referred to Howe variously as a "cow puncher," a "cattle gangster" and a "drunken brute." The language was strong, but so was the evidence. Assuming that the use of such language in the heat of a trial is misconduct, it does not appear, in the light of the evidence and the verdicts reached, that such misconduct was prejudicial.

It further appears that an effort was made by counsel for plaintiffs to show that Tassi's reputation for peace and quiet was bad. In his opening statement counsel said: "We will show by evidence that will be introduced that Tassi is a notorious brawler, that his reputation for peace and quiet is very bad, an ex-prize fighter, and vicious and bad-tempered, and an ungovernable man, and inclined at every chance to take the law into his own hands. We will show that he has slugged with his fist, shortly preceding this incident, numerous people, if you please, of somewhat the same characteristics—elderly and helpless people." At this point an objection was interposed and the court ruled, "I think you had better leave out the reference to specific acts in your opening statement." A little later in the opening statement the following appears: "We will show Tassi not only refused to do it [negotiate a settlement with the Deevys], but appeared in Mr. Gardiner's [an attorney then representing the Deevys] office, addressing him by such names as 'shyster,' and so forth, and threatened to kick him out of his own window, and accused him of fomenting trouble, trying to put himself in the way of Mr. Tassi's right——

"Mr. Davis: Counsel is talking of specific acts, none of which would be admissible in evidence, in attempting to prove what he claims he can prove, and this bad reputation by——

"The Court: It is directed to malice, as I understand it. . . . An offer of proof in support of malice, or what you expect to prove; objection overruled." During the reception of evidence plaintiffs called a witness who testified that he knew the general reputation of Tassi in the community for peace and quiet but upon objection the subject was abandoned without the fact being stated.

It is now conceded by plaintiffs that the character or reputation of a defendant is not in issue in civil actions

for assault (see *Vance* v. *Richardson*, (1895) 110 Cal. 414, 416-417 [42 P. 909])' and that testimony of specific instances of misconduct is not admissible (see *Marks* v. *Reissinger*, (1917) 35 Cal. App. 44, 57-58 [169 P. 243]). Assuming that the above-recited statements of intention relative to proof were wholly improper it nevertheless does not appear that defendants were prejudiced thereby. The court in its instructions admonished the jury carefully, clearly, comprehensively, and in various forms of expression, as to their duty to consider legal evidence only, and to distinguish carefully between the facts testified to by witnesses and statements by counsel. It likewise correctly instructed the jurors as to the legitimate purpose of argument; as to questions and offers of proof to which objections had been sustained; and as to statements by counsel and discussions between court and counsel. Furthermore the trial court with like accuracy and clarity cautioned the jurors to deliberate and act fairly and dispassionately and not to permit themselves ''to be influenced in the slightest degree by sympathy, prejudice or any emotion in favor or against any party to the action.'' In the light of all the evidence properly admitted in this case and upon the entire record we are satisfied that the conclusion of the trial judge, on the motion for a new trial, that defendants suffered no prejudice in the premises, is controlling under the circumstances. (*Gerberich* v. *Southern Cal. Edison Co.*, (1938) 26 Cal.App.2d 471, 476 [79 P.2d 783].)

■ Defendants assert errors in the admission of evidence showing Mr. Deevy's pre-existing heart condition. The trial court's ruling was proper. Such evidence provided a basis for showing that the condition was aggravated by the injury inflicted. The doctor's testimony as to the ensuing nervous augmentation of the chronic miocarditis and the more rapid heart beats, and his opinion that exertion or altercation was dangerous or harmful, coupled with Mr. Deevy's testimony as to the nature of his injuries and his symptoms, was sufficient to warrant the jury's conclusion that the condition had been aggravated by the assault and battery (see *Smith* v. *Schumacker*, (1938) 30 Cal.App.2d 251, 263 [85 P.2d 967]; *Kerby* v. *Elk Grove Union H. S. Dist.*, (1934) 1 Cal.App.2d 246, 251 [36 P.2d 431]).

■ It is also contended by defendants that the instructions relative to Tassi's right to use force in repossessing the cattle were conflicting and confusing as stating in substance that the mortgagee of chattels may not use force to

acquire possession from the mortgagor in possession but that an owner of personal property "may retake such property by force if necessary from one *who wrongfully deprives him* of his property." (Italics added.) ▆ A sufficient answer to this contention is that any inconsistency in such instructions favored the defendants. On any construction placed on them the instructions on that subject did not state the law more favorably to plaintiffs than was proper. ▆ Moreover such instruction, covering two different factual situations, was proper as a protection to defendants against Nellie Deevy's case in the event that the jury concluded that defendants had succeeded in gaining exclusive possession of the cattle before she was injured. ▆ Lastly, the record does not show at whose request the instructions complained of were given.

▆ The last observation also applies to an instruction on the measure of damages, likewise complained of. It declared that "Mental suffering occasioned by any future pain developing from injuries are [*sic*] also proper elements [*sic*] of damages." This statement was preceded by the limitation, "which the evidence may show as reasonably and necessarily may be suffered by them [plaintiffs], or either of them, for injuries caused by the defendants, if any." The instruction was awkwardly worded but it correctly stated the law and the evidence hereinabove epitomized justified giving it. ▆ In any event, even if it were held that the instructions complained of were erroneously given, that error would not be available to defendants, as on the record we must presume that such instructions were given at defendants' request. (2 Cal. Jur. 870, § 509; *Gray* v. *Eschen,* (1899) 125 Cal. 1, 6 [57 P. 664]; *Buckley* v. *Shell Chemical Co.,* (1939) 32 Cal.App.2d 209, 217 [89 P.2d 453]; *Forbes* v. *Mattos,* (1939) 35 Cal.App.2d 481, 484 [96 P.2d 166].)

▆ Error is urged in the refusal of the trial court to permit, *after the evidence had been closed,* the filing of an amended answer pleading self-defense as a special defense, and in refusing to permit argument on that theory. The rulings were within the discretion of the trial court. The character of the evidence introduced by defendants did not tend to show self-defense. They did not testify to facts tending to the conclusion that Nellie Deevy was struck with the "bull-whip" or ridden down by the horseman in self-defense. Likewise as to the other plaintiffs, the factual issues were not as to self-defense but as to whether the physical acts of assault and battery were committed, and by whom.

Lastly, it is contended that the awards of exemplary damages are contrary to law because Tassi sought to take possession of the cattle only after he had been advised by his attorney that he had a legal right so to do. There is no merit in this contention. It was not for any effort lawfully to take the cattle that plaintiffs brought this action. It is predicated solely on unlawful, malicious, and oppressive assaults and batteries which no advice could justify.

As to J. A. Tassi, however, the imposition of the punitive award is not tenable. The evidence fails to show that he personally participated in the wrongful acts or that he previously authorized them or subsequently ratified them with full knowledge of the facts. In the absence of such showing he is not liable in exemplary damages. (*Warner* v. *Southern Pacific Co.,* (1896) 113 Cal. 105, 111 [45 P. 187, 54 Am. St.Rep. 327] ; *Davis* v. *Hearst,* (1911) 160 Cal. 143, 165 [116 P. 530] ; *Lightner Mining Co.* v. *Lane, supra,* (1911) 161 Cal. 689, 705.) The stipulation which counsel entered into during the trial, in connection with setting aside the default of J. A. Tassi, to the effect that both Tassis should be deemed parties defendant from the inception of the trial and "that any judgment that may be taken against E. A. Tassi, if the jury should return a verdict in favor of the plaintiff, any such verdict may also be rendered *in favor* of J. A. Tassi," should not, in our opinion, be construed as an agreement that an award of punitive damages properly assessed against E. A. Tassi only, for his own and Howe's (since E. A. Tassi was personally present and directing Howe) malicious and oppressive conduct, should also be included in the judgment against J. A. Tassi. Upon the record it does not appear that such was the intention of counsel. As to compensatory damages, however, J. A. Tassi was the owner of the San Jose Cow Market, and the employer of E. A. Tassi. The employer is liable to third persons for wrongful acts committed by his agent in and as a part of the transactions of the business of the agency. This is true even though the acts be willful and malicious. The test is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal and while the agent was still occupying himself with the principal's business within the scope of his employment. (*Andrews* v. *Seidner,* (1942) 49 Cal.App.2d 427, 429-430 [121 P.2d 863] ; *Stansell* v. *Safeway Stores, Inc.,* (1941) 44 Cal.App.2d 822, 823-825 [113 P.2d 264].)

The judgment is modified by deducting the sum of $500 from the award to each plaintiff as against the defendant J. A. Tassi only, and as so modified is affirmed, respondents to recover costs on appeal.

Gibson, C. J., Shenk, J., Curtis, J., Carter, J., and Traynor, J., concurred.