[Civ. No. 13161. First Dist., Div. Two. Feb. 4, 1947.]

LEE N. FOSTER, JR., Respondent, v. JOHN PESTANA et al., Appellants.

Kenneth C. Gillis and Mathew Weber for Appellants.

Augustin Donovan and Louis B. DeAvila for Respondent.

GOODELL, J.—The respondent recovered a verdict for $16,769.58 for personal injuries. From the judgment and from an order denying a new trial this appeal was taken.

The appellant Pestana had a contract to lay sewer pipe and storm drains at a housing project in San Mateo County. On July 18, 1944 respondent drove a truck and trailer loaded

with terra cotta pipe from a factory across the bay to the building site. On arrival the appellant Jensen, who was Pestana's foreman, got aboard the trailer and while the respondent drove slowly Jensen dropped over the side of the trailer 50 or so sections of pipe along the route of the projected pipe line. They then parked and proceeded to unload and stack the rest of the pipe. Jensen stood on the trailer and dropped the pipe, section after section, over the side onto the ground, while respondent and one Thornley, an employee of Pestana, carried it by hand to a stock pile about 15 feet away. The bed of the truck was about four feet above the ground and the top of the load was about four feet above the bed. Each section of pipe was three feet long, 10 inches in diameter and weighed 70 pounds. One end was bell-shaped, which somewhat flared out that end.

In addition to the 50 or so sections dropped off along the trench line, 25 or 30 had been dropped over the trailer's side near the stock pile and carried away by respondent and Thornley without incident.

Respondent testified that as he returned from the stack for another section he looked up when about five feet from the trailer and saw Jensen standing erect on the parked trailer his hands at his side. Respondent testified that he then bent over, took hold of the pipe, and was about to lift it when his left hand was struck by a section of pipe just dropped over the side by Jensen. He said the section of which he had hold was on the ground about three feet from the trailer and right beneath where Jensen stood. Jensen and Thornley both testified that respondent, instead of being immediately underneath Jensen, was three or four feet toward the rear of the trailer. They also testified that respondent had already lifted the first piece of pipe from the ground and had started away with it when the second piece bounced and caught his left hand which had hold of the section he was carrying.

Respondent testified that he did not see the pipe before it hit him. Jensen and Thornley both testified that it landed on the ground on end, bounced two or three feet in the air, and then struck respondent's hand. Jensen testified that in unloading all this pipe he slid the sections over the edge of the trailer's side in such a way that they would land on end and fall over on their side, coming to rest a few feet from the trailer; that all of them previously had done just that; that none had bounced before the one that injured respondent,

and that he had handled that one the same way as the others. Thornley, a witness for the defense, testified on cross-examination that "They all bounced up a little" and on redirect examination he stated that none had bounced "in the same manner" as the one that hit respondent. The fact that about 50 sections had been dropped off while the truck and trailer were in motion and 25 or 30 after parking, presented a picture of the way the pieces might have acted before respondent was hit, if the jury accepted Thornley's version as against Jensen's version that none had previously bounced. Jensen was cross-examined as to the manner in which he slid the sections over the side of the trailer, as follows: "Q. How do they get by the edge, the bell sticks out, doesn't it? A. Yes, you just lift it over. Q. That's more or less of a drop, instead of a slide? A. Yes. Q. You have to clear that edge, or the thing would go topsy-turvy, get hooked on the edge of the sliding surface? A. Yes. Q. So you had to sort-of shove that one off, partially toss it, you might say? A. Yes, but not in this particular instance. Q. Some of them were tossed and some of them were slid? A. In this particular instance, we were taking off the top row, and they were all bell-down, that's all we were taking off. Q. And they are heavier at the bell-end, aren't they? A. They would be."

Jensen testified with respect to the piece that struck respondent: "It hit the ground, and there must have been different character of ground there, because the pipe dropped, bounced."

█ Respondent testified that immediately after the pipe hit him Jensen exclaimed, "Damn, I didn't see it, it was my fault, I should have looked." Jensen denied making any such statement, and Thornley, who was but a few feet away, said he heard no such statement, but would not testify that it was not made. He said he heard Jensen say he was sorry. Respondent testified also that while Jensen was taking him to the hospital Jensen said several times that he had not looked and that "he was sorry, it was kind of stupid of him for not watching what he was doing." Jensen denied that he had admitted fault, then or at any time, but did admit that he had said he was sorry, and that he had "waited for him to get out of the way, but the pipe jumped, I couldn't help it." On the stand he stated that the two others could not carry the pipe away as fast as he could put it over the side. He admitted that he had given no warning before letting the pipe go.

He said when he saw the respondent he "had a piece of pipe slid out, ready to drop" and "waited for him to get out of the way before I dropped it."

Appellants contend that because the pipe bounced in an unusual way respondent's injury was a pure accident and not the result of negligence. Respondent on the other hand argues that whether it was accident or carelessness was purely a jury question; that with all the facts and circumstances before them it was their question, but in addition thereto he argues the spontaneous exclamation "Damn, I didn't see it, it was my fault, I should have looked" was sufficient, without more, to establish negligence.

The exclamation immediately after the impact was unquestionably competent evidence under the res gestae rule, and admissible against the appellant employer as well as against the appellant employee, who uttered it. (*Showalter* v. *Western Pacific R. R. Co.*, 16 Cal.2d 460, 467 [106 P.2d 895]; *Lane* v. *Pacific Greyhound Lines*, 26 Cal.2d 575, 582 [160 P.2d 21].

■ The making of any such statement was denied. Whether it was made was a question for the jury. If made, its weight was likewise a jury question. (*Fawkes* v. *Reynolds*, 190 Cal. 204, 213 [211 P. 449].) In the last case it is said: "Under this instruction they were not precluded from determining the case solely upon the defendant's admission if they felt that the admission was in fact conclusive against the contentions advanced by the defendant. . . ." ■ Eliminating altogether the admissions which respondent claims were made on the way to the hospital, we are satisfied that the spontaneous exclamation alone was sufficient, if believed, to establish negligence. When taken in connection with all the other evidence, including Thornley's testimony that all the pipe had "bounced up a little" although not "in the same manner" that the last piece did, (which, if believed, would show that Jensen must have known of a tendency to bounce) plus the fact that Jensen was handling a heavy piece of material six or eight feet above respondent, we have no doubt that there was sufficient evidence to sustain the verdict on the question of liability.

■ The prayer of the complaint was for $16,769.58, and the jury awarded every cent prayed for. Appellant complains that the verdict was excessive. The latest restatement of the rule on this subject is found in the case of *Roedder* v. *Lindsley*, 28 Cal.2d 820, 822 [172 P.2d 353], as follows:

"In assessing general damages, the jury should consider all relevant circumstances, including the age and sex of the injured person, his physical condition before and after the injury, the extent, severity and duration of bodily and mental suffering caused by the injury, and any impairment of earning capacity resulting therefrom. Since there is no exact correspondence between money and physical or mental injury and suffering, the various factors involved are not capable of exact proof in terms of dollars and cents, and the only standard is such an amount as a reasonable person would estimate as fair compensation. Hence, necessarily, the determination of the amount of damages is, in the first instance, left to the exercise of a sound discretion by the jury, and a verdict will not be disturbed by an appellate court unless it is so grossly disproportionate to any reasonable limit of compensation as shown by the evidence that it shocks one's sense of justice and raises a presumption that it is based on passion and prejudice rather than sober judgment. (*Deevy* v. *Tassi*, 21 Cal.2d 109, 120-121 [130 P.2d 389]; *Loper* v. *Morrison*, 23 Cal.2d 600, 610 [145 P.2d 1]; *Turnipseed* v. *Hoffman*, 23 Cal.2d 532, 535 [144 P.2d 797].)''

The trial judge was called on to exercise his discretion on this important question, and his denial of a new trial indicates that he, with power to "consider the evidence anew, determine anew the facts, and set aside the verdict if it is not just" (See *Hale* v. *San Bernardino etc. Co.*, 156 Cal. 713, 715 [106 P. 83]) concluded that the verdict was not excessive. As said in *Roedder* v. *Linsley, supra*, his "conclusion in that regard is persuasive in determining whether the verdict was based upon passion or prejudice. (*Deevy* v. *Tassi, supra*, 21 Cal.2d 109, 121; *Ostertag* v. *Bethlehem etc. Corp.*, 65 Cal. App.2d 795, 805 [151 P.2d 647].)''

We might add that the trial judge not only heard the testimony of the doctors but saw the X-rays of the hand and also saw the doctor demonstrate with it before the jury.

To contrast the size of this award with verdicts in other instances of hand injuries, a number of cases from outside states are cited by appellants. All of them involve fingers and thumbs, while respondent's injury was quite different. But for an entirely distinct reason they are valueless as criteria, for the earliest case was decided over 50 years ago and the most recent 33 years ago. (See *Connor* v. *Henderson*, 108 Cal.App. 237, 242 [291 P. 641].) Appellants also cite

*Diehl* v. *Swett-Davenport Lumber Co.*, 14 Cal.App. 495 [112 P. 561], decided in 1910 where the operator of a machine in a planing mill lost his right fore arm and was awarded only $5,000. The contention that it was excessive was dismissed by the court with the curt comment that it had no merit. It does not follow that because a plaintiff 36 years ago received a none too generous verdict, the award herein was too generous.

The verdict in this case would have presented an altogether different problem some years ago than it presents today. In *O'Meara* v. *Haiden* (1928), 204 Cal. 354, at 366-368 [268 P. 334, 60 A.L.R. 1381] will be found an interesting discussion of the bearing of the purchasing power of money on the size of verdicts. Therein the court declined to use as a criterion one of its own decisions rendered in October of 1917, and had this to say respecting happenings and trends in the intervening eleven years: "Since the decision thereof radical changes have taken place in social conditions, and particularly in conditions affecting the costs of living. Courts have recognized this fact in passing upon the size of verdicts and have almost invariably made allowances therefor [citations]."

In *Rowe* v. *Rennick* (1931), 112 Cal.App. 576 [297 P. 603], the District Court of Appeal without referring to *O'Meara* v. *Haiden,* uses the same reasoning as follows:

"In an extended note covering approximately 196 pages appended to the case of *Quinn* v. *Chicago, Mil. & St. Paul Ry. Co.*, 46 A.L.R. 1228, are collected a large number of cases dealing with verdicts in personal injury cases. A considerable number of these cases involve causes which were tried at a time when the purchasing power of money was much greater than at present, which fact must be taken into consideration when considering an award of damages, as an award of damages in the sum of $7,500 made prior to the World War would, in purchasing power, we think, equal the award in this case. The difference in the purchasing power of money is a common fact of which we think we may properly take notice." The verdict in that case was rendered in March, 1929, and was for $10,800.

What has happened in the 15 or more years since these two cases were decided is common knowledge and serves but to reaffirm the fairness and soundness of their reasoning. Many cases have followed the O'Meara case on that subject.

The respondent was 27 years of age at the time of the injury and has a long expectancy of life. He is married and has a small son. He has worked ever since he was 17, driving trucks and doing heavy manual labor. His injury was characterized by the doctor who attended him as a severe crushing injury; the X-rays "showed that the third metacarpal, that is the bone that is at the base of the middle finger, had been badly crushed and shattered, very near to the joint, . . . It was a bad sort of an injury to treat, on account of the proximity of the joint." The doctor testified further "I knew that unless we could maintain the alignment of this row of joints across the base of the fingers that it would pretty badly cripple him." The hand was put in a cast and traction applied. This did not accomplish the expected results, and some months later the doctor found the hand in worse shape than before, without any fresh injury intervening. The doctor testified that an operation would be necessary to improve the hand, but that its success was not a certainty and if not successful the respondent might have a claw hand. In his opinion the injury was a permanent one. He demonstrated to the jury and judge with respondent's hand how the metacarpal in question was then movable, and how it inclined over toward the little finger instead of maintaining normal alignment along the middle of the hand to form junction with the middle finger at the joint. In this doctor's opinion there was no bony union.

The doctor who testified for the defense was of the opinion that there was bony union. He saw no necessity for an operation, but felt that everything had been done that could be done for the hand. He did not say that the injury was not permanent.

The evidence showed that after respondent had returned to work and had resumed the driving of the same truck (on which adjustments were made to render it easier for him to handle) he found he could not continue, and took a lighter job. From that he changed to a still lighter job, running a delivery truck for a fish company, and from that he went into a service station on his own account, the earnings from which were not permitted by the court to be shown. His income during the time between his injury and the trial had been decreased from about $85 to about $65 a week according to respondent's showing.

Special damages amounted to $1,769.58.

■ In a case such as this a person's ability to earn, rather than the record of his past earnings, is the proper factor in computing the impairment of his future earning power (*Hosman* v. *Southern Pacific Co.*, 28 Cal.App.2d 621 [83 P.2d 88]; *Holmes* v. *California etc. Co.*, 69 Cal.App. 779 [232 P. 178]; *Storrs* v. *Los Angeles Traction Co.*, 134 Cal. 91 [66 P. 72]; *Hicks* v. *Ocean Shore Railroad, Inc.*, 18 Cal.2d 773, 784 [117 P.2d 850]). It needs no extended argument to show that the respondent's earning capacity and ability has been materially impaired by the very nature of this injury, according to the testimony of the doctors who testified on *both* sides of this case. The medical testimony shows that the grip in his injured hand has been substantially weakened, which factor directly affects his ability to do the kind of work he has always done. Whatever loss of earnings respondent suffered before trial—discussed by counsel for appellant in their brief —is comparatively unimportant compared to what loss in the future—in the 40 or so years of his expectancy—he may be reasonably expected to suffer. This is but one of the elements, but an important one.

An operation will, according to his doctor's testimony, confine him to a hospital for some time but it will immobilize his hand for a great length of time, and after that there will be a considerable period while the hand by exercise, and otherwise, is brought back to relative mobility and functioning. This presupposes a successful operation. If it is unsuccessful a claw hand might result, and the connotations of such a deformity (a possibility only it is true) need not be enlarged on. The doctor who testified for the defense did not say that a claw hand was not a possible consequence of an operation.

The respondent testified that only a few days before the trial the hand had given him considerable trouble.

Added to these elements there is that of pain and suffering.

In *Hicks* v. *Ocean Shore Railroad Inc.*, *supra*, the hand injury was somewhat comparable with that in this case. A verdict there of $15,000 was reduced by the trial judge to $8,500. On appeal it was claimed that even the $8,500 was excessive, but held to be not so. That was in 1941, before our entry into World War II, and we feel that a court passing on the same question now, would have thought twice before making such a reduction. In *Perry* v. *Angelus Hospital Assn.*, 172 Cal. 311 [156 P. 449], a verdict of $11,500 was held to be

894

not excessive for a hand injury. That was in 1916, 30 years ago. In *May* v. *Farrell*, 94 Cal.App. 703, 714 [271 P. 789] a verdict of $10,000 was held to be not excessive for a hand injury. That case was decided in 1928, the same year as the Supreme Court expressed itself in *O'Meara* v. *Haiden, supra.* Verdicts in each case for substantially larger amounts undoubtedly would be upheld under present economic conditions.

We adopt what was said in *Roedder* v. *Lindsley, supra,* on this subject: "The question of what may be reasonable compensation in cases of this kind is a matter on which there legitimately may be a wide difference of opinion (*Bellman* v. *San Francisco H. S. Dist.*, 11 Cal.2d 576, 586 [81 P.2d 894]), and we cannot say that the amount awarded by the jury in this case is so large as to indicate that it was the result of passion or prejudice."

The judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.