[Civ. No. 16400. First Dist., Div. Two. Dec. 8, 1955.]

JACK M. FIELDS, Respondent, v. CITY OF OAKLAND et al., Appellants.

Carroll, Davis & Burdick for Appellants.

J. Adrian Palmquist and Francis T. Cornish for Respondent.

DOOLING, J.—Defendants, City of Oakland and its Board of Port Commissioners appeal from a judgment recovered against them after a jury trial for the wrongful death of plaintiff's wife and from an order denying their motion for judgment notwithstanding the verdict.

The evidence shows that on or about February 1, 1950, appellants entered into a contract with Marshall and Squires, called a "License and Concession Agreement," whereby for a specified rental Squires and Marshall were to have the use and occupancy of the portion of the building in which respondent's wife was afterwards injured from February 1, 1950, to January 31, 1951. About March 1, 1950, respondent became a partner of Marshall and Squires in the business conducted in these premises. After the occupancy of the premises was commenced appellants, acting through two electricians employed by them, installed a fluoresent light fixture in the premises. This fixture was hung from the ceiling by two chains attached at the ceiling to two eyebolts. Respondent was present when this light fixture was installed and directed the electricians where to place it but took no part in its installation.

About August 31, 1950, Marshall and Squires withdrew from the business and it was thereafter carried on by respondent and his wife in the same premises. The original "License and Concession Agreement" provided that the taking possession by the licensees constituted an acknowledgment that the premises were properly constructed and in good tenantable condition and placed the full burden of repairs on the licensees, including a waiver of appellants' obligations under Civil Code, sections 1941 and 1942. It also contained the following provision:

"12. *Liability for Damages*: This agreement is made upon the express condition that the Port shall be free from all liabilities and claims for damages and/or suits for or by reason of any injury or injuries to any person or persons or property of any kind whatsoever, whether the person or property of Licensee, its agents or employees, or third persons, from any cause or causes whatsoever while in or upon said premises or any part thereof during the term of this agreement or occasioned by any occupancy or use of said premises or any activity carried on by Licensee in connection therewith, and Licensee hereby covenants and agrees to indemnify and save harmless the Port from all liabilities, charges, expenses (including counsel fees) and costs on account of or by reason of any such injuries, liabilities, claims,

suits or losses however occurring or damages growing out of same."

When Marshall and Squires retired from the business they addressed the following letter to appellant port commissioners which was signed by Marshall, Squires and respondent:

"Gentlemen:

"This will notify you that Harold W. Squires, William R. Marshall, and Jack Merle Fields have this day terminated their partnership in 'True-Flex Products Company.'

"From and after this date, said business will be owned and conducted by Jack Merle Fields and Frances R. Fields. Said Harold W. Squires and William R. Marshall will have no connection whatsoever therewith.

"Jack Merle Fields has, by the agreement terminating said partnership, assumed and agreed to pay all prior accounts, indebtednesses and obligations of said partnership."

The reply to this letter from appellant port commissioners was dated September 6, 1950, and addressed to the True-Flex Products Company:

"Gentlemen:

"This will acknowledge receipt of a letter signed by Harold W. Squires, William R. Marshall and Jack Merle Fields, notifying us that the partnership in True-Flex Products Company has been terminated as of August the 31st, and that the company will carry on under the same name, with the ownership vested in Jack Merle Fields and Frances R. Fields. The lease now in effect is signed by Harold W. Squires and William R. Marshall as copartners.

"Our books indicate that there is, as of August the 31st, a balance for electric and water service totaling $56.64. Until these invoices are paid, we cannot release Mr. Squires and Mr. Marshall from responsibility for the payment of these invoices. Upon payment of this amount, we will transfer the responsibility for the lease to the new partners."

True-Flex Products Company was the fictitious name under which the business was conducted.

On November 13, 1950, one of the chains supporting the fluorescent light fixture became disengaged from the eyebolt in the ceiling and the light swung down on the other chain striking respondent's wife and causing the injuries from which she subsequently died. The evidence shows that the type of chain used to suspend the fixture was one composed of links with an opening in each link, the ends of which were brought

together to close them. The witness King, an electrician employed by the appellants, examined the chain after the fixture had fallen. He testified that in inserting the end link of the chain in the eyebolt at the ceiling the ends of the link should be pressed apart by a twisting motion and slipped over the eyebolt. "(I)t should be pushed to one side, never supposed to be opened, with a pull that way, it is supposed to be a twist, and then when you get through onto your eye, you bring them up and it is supposed to set." He further testified that the link which had been attached to the eyebolt was not closed in this way, there was "a minute opening, it was so small that it wouldn't have slid through there on its own weight."

"Q. But it evidently did fall from that point? A. I assume it did, that is what they told me when I got there."

It is clear, since the evidence shows that the chain became disengaged from the eyebolt and the eyebolt was still intact, that despite Mr. King's opinion that the opening in the link was so small that it would not have slid through on its own weight, that must be exactly what occurred. At the very least the jury was entitled to draw this inference from the evidence and we must assume in support of the verdict that they did in fact do so.

Appellants argue that under the law of landlord and tenant no liability attached to them. ■ The jury was instructed that in order to recover the plaintiff must prove:

"One: That the light fixture in question was defectively installed.

"Two: That the defect in question, if any, was one that could not have been discovered upon ordinary inspection of the premises by the tenant, and

"Three: That the defendants had knowledge of said defective installation, if any, and failed to inform the tenants or licensees of the premises of the defective installation, if any."

This was a correct exposition of the law. In *Shotwell* v. *Bloom*, 60 Cal.App.2d 303, 309-310 [140 P.2d 728], the court quotes the following from 1 Tiffany, Landlord and Tenant, page 562, section 86, subdivision d:

"The rule above stated, that the lessor is under no obligation to the lessee as regards the condition of the premises at the time of the demise, is subject to an exception to the effect that, if there is some hidden defect in the premises, or danger thereon, which is known to the lessor at the time

of making the lease, but which is not apparent to the intending lessee, the lessor is bound to inform the latter thereof, and failing to do so, he is liable for injuries to the tenant arising therefrom.''

This rule is not questioned by appellants. In fact, since the record does not show at whose request this instruction was given, we must assume on appeal that it was proposed by appellants themselves. (*Deevy* v. *Tassi,* 21 Cal.2d 109, 124 [130 P.2d 389]; *Lynch* v. *Birdwell,* 44 Cal.2d 839, 846-847 [285 P.2d 919].)

 The evidence is sufficient to support the finding of the jury that all of these necessary elements were present. The evidence would support a finding that the electricians in installing the fixture did not open and close the link with the twisting motion described by the witness King, but separated and brought the ends together in such fashion that the weight of the fixture gradually spread them apart causing the link so opened to slip from the eyebolt. If the jury drew this reasonable inference the defective condition could be reasonably found to be the result of negligence in the installation. The link was at the ceiling where it might reasonably be found to be a latent defect not discoverable by a reasonable examination by respondent. Respondent testified that he did not examine the manner in which the chain was closed over the eyebolt and the jury were entitled to find that the defect would not have been discoverable by the respondent's making a reasonable inspection of the premises and using ordinary care. The jury was also entitled to find that since the installation was made by appellants' agents they had knowledge of the defective installation, which knowledge was imputed to appellants. (*Hale* v. *Depaoli,* 33 Cal.2d 228, 231 [201 P.2d 1, 13 A.L.R.2d 183].)

An instruction was given on res ipsa loquitur. Appellants do not question the correctness of the instruction as to form, but they do claim that since respondent had possession of the fixture at the time of the mishap the necessary element of exclusive possession in them was not present. It is now well settled however that res ipsa will apply where the defendant had possession at the time when the negligence must have occurred provided there is reasonable evidence to prove that no one tampered with the property thereafter. (*Zentz* v. *Coca Cola Bottling Co.,* 39 Cal.2d 436, 444 [247 P.2d 344].) Here respondent testified that he never touched the fixture after its installation and so far as he knew nobody else had

done so. Since he was regularly present on the premises he would be in a position to know if the fixture had been tampered with during regular business hours. "Although, as we have seen, the doctrine will not ordinarily apply if it is equally probable that the negligence was that of someone other than the defendant, the plaintiff need not exclude all other persons who might possibly have been responsible where the defendant's negligence appears to be the more probable explanation of the accident." (*Zentz* v. *Coca Cola Bottling Co.*, *supra*, 39 Cal.2d at pp. 443-444.) The evidence is sufficient to meet this requirement. Light fixtures properly installed do not ordinarily fall of their own weight and the facts of this case support the inference that this light fixture would not have fallen had it not been negligently installed.

Appellants argue further that the exculpatory clause in section 12 of the "License and Concession Agreement" relieves them of liability. The original agreement was not executed by respondent but by Squires and Marshall only. When respondent became a partner of Squires and Marshall he became subject, *as partner*, to the conditions of their lease. (Corp. Code, § 15017.) When, however, that partnership was terminated his liability *as their partner*, was terminated. His liability from that time forward depended upon the new agreement entered into between appellants and himself, as evidenced by the exchange of letters quoted above. In his letter to appellants he stated that he had "assumed and agreed to pay all prior accounts, indebtednesses and obligations of said partnership."

It is to be noted that this language, "assumed and agreed to pay," in its natural sense applies only to "accounts, indebtednesses and obligations" of a financial nature which could be satisfied by "payment." The language also refers only to "prior" obligations and does not extend into the future. This language is not apt to describe the exculpatory clause in question. In their reply appellants wrote: "Upon payment of this amount, we will transfer the responsibility for the lease to the new partners."

Respondent testified that he had never seen the lease and had no knowledge of the exculpatory clause. While such exculpatory provisions, exempting the lessor from liability even for active negligence, are valid and enforceable (*Stephens* v. *Southern Pac. Co.*, 109 Cal. 86 [41 P. 783, 50 Am.St.Rep. 17, 29 L.R.A. 751]; *Werner* v. *Knoll*, 89 Cal.App.2d 474 [201 P.2d 45]) the later decisions point out that such provisions are to be strictly construed and particularly in

the case of active negligence are not to be extended to cover such negligence unless the intention to do so is clearly expressed (*Butt* v. *Bertola,* 110 Cal.App.2d 128, 138-140 [242 P.2d 32]; *Barkett* v. *Brucato,* 122 Cal.App.2d 264, 277-279 [264 P.2d 978]; *Basin Oil Co.* v. *Baash-Ross Tool Co.,* 125 Cal.App.2d 578, 594 [271 P.2d 122]; *Sproul* v. *Cuddy,* 131 Cal.App.2d 85, 95 [280 P.2d 158].) Under the reasoning of *Butt* v. *Bertola, supra,* and *Barkett* v. *Brucato, supra,* the exculpatory clause would not have exempted appellants from liability for *active* negligence even as to the parties to the agreement. We need not go so far in this case. ■ Here the claimed exemption must be spelled out of the vague language of a letter: "We will transfer the responsibility for the lease to the new partners." The language is not that of a present transfer but only a promise to do so in the future. No formal agreement of assumption of the provisions of the lease was ever presented to respondent or executed by him. In view of the vagueness of this language and the rule of strict construction of such exculpatory agreements we cannot spell out of this exchange of letters an agreement by respondent to be bound by the exculpatory clause of the lease between appellants and Squires and Marshall.

This conclusion makes it unnecessary to consider appellants' final argument that the court erred in leaving to the jury the question whether or not the lease had been assigned to respondent. The record does not show at whose request this instruction was given and under the rule of *Deevy* v. *Tassi, supra,* 21 Cal.2d 109, we must assume that it was requested by appellants. In this respect the record contains certain instructions requested by appellants under the heading: "Jury instructions requested by defendants . . . and refused by the court, or covered by other instructions." No complaint is made of the failure to give any of these. The record nowhere shows who requested any of the instructions actually given. The jury must have found that the lease was not assigned since the instruction told the jury that if it was assigned to respondent respondent could not recover. In any event, since we have concluded that under the evidence respondent was not bound by the exculpatory clause the giving of this instruction was more favorable to appellants than the facts warranted.

Judgment and order affirmed.

Nourse, P. J., and Kaufman, J., concurred.