OSCAR RODRÍGUEZ RAMOS, Plaintiff and Appellee, *v.* WATERMAN DOCK COMPANY, Defendant and Appellant.

No. 11186.   Argued July 7, 1954.—Decided October 7, 1955.

*James R. Beverley, R. Rodríguez Lebrón* and *Ramón Enrique Quiñones* for appellant.   *Guillermo Bauzá* for appellee.

Mr. Chief Justice Snyder delivered the opinion of the Court.

This is a suit for damages for malicious prosecution, slander, and false arrest. After a trial on the merits, the trial court entered a judgment for $3,000 and $250 as attorney's fees in favor of the plaintiff. The case is here on appeal by the defendant from that judgment.

Oscar Rodríguez Ramos, the plaintiff, was employed by Waterman Dock Company, the defendant, as a checker. On June 25, 1947 Varo Quiñones came to the defendant's dock to load 200 tins of lard and 50 sacks of oats. The 200 tins of lard were loaded on the truck under the supervision of the plaintiff, who then left to perform other duties. In the absence of the plaintiff, Quiñones ordered his two peons to load 10 more tins of lard on the truck. Apparently it was subsequently established that Quiñones did this because he miscounted the tins and thought in good faith that only 190 tins had been placed in his truck.

When the truck arrived at the gate, two of the defendant's employees, in the regular performance of their duties, checked the load against the cargo ticket. They discovered that the truck contained 210 tins of lard whereas the cargo ticket called for 200 tins. One of these employees, pursuant to previous instructions of their superiors for such a situation, communicated these facts to Joseph F. Fortunatti, Operations Manager of the defendant. The latter immediately telephoned the Federal Bureau of Investigation, popularly known as the F.B.I. Fortunatti told the F.B.I. the facts and his belief that a theft was involved. He did not mention the name of any person as being responsible therefor.

The F.B.I. sent two agents to the defendant's dock to investigate the matter. One of the agents, Howard D. Wesley, came toward the plaintiff accompanied by W. Olsip, Dock Superintendent of the defendant, and in the words of the plaintiff: ". . . when they were coming toward me, Mr. Olsip pointed me out with his index finger to the F.B.I. agent.

The agent was very courteous to me and asked me a number of questions about several things. He asked me if I was Oscar Rodríguez Ramos, I told him, yes sir, at your orders, and he told me, 'I want to talk to you.' And we continued to talk and to walk, and when we were walking on the street toward the office, since among other things he had invited me to accompany him to the dock office, and while I was conducted to the offices, Mr. Olsip said to me these words which I remember well, in front of the F.B.I.: 'This is the only way to stop pilferage.' "

Quiñones and his two peons and the plaintiff were questioned in Fortunatti's office as to the facts of the case, including among other things the system of dispatching cargo. Olsip and Fortunatti were present during the questioning of the plaintiff, which was done principally by the two F.B.I. agents. The plaintiff said that during the investigation "they"—apparently the persons questioning him—assumed "A passive attitude; what they were doing of course was in compliance with their duty . . .". The plaintiff was asked: "At any time before the F.B.I., in their presence, did Messrs. Olsip and Fortunatti say that you had taken the 10 tins of lard?" He replied: "At no time; I saw no accusation during the investigation." After the questioning in Fortunatti's office, the truck was permitted to leave with the merchandise and the plaintiff was told to go back to work.

At the request of the F.B.I. agents, the plaintiff went to the F.B.I. offices the next day at 8 a.m. for further investigation. Olsip and Fortunatti were not present at this investigation, which was conducted exclusively by F.B.I. agents and which continued until 5 p.m. At that time the plaintiff was arrested under a warrant issued by the United States Commissioner on the basis of a complaint signed by Wesley charging the plaintiff, Quiñones, and the latter's peons with stealing merchandise which was part of an interstate shipment of freight, in violation of 18 U.S.C. § 409. The plaintiff was taken handcuffed from the F.B.I. of-

fices through the streets of San Juan to La Princesa jail. The plaintiff was released on bond at 9 p.m. of the same day. Two months later the complaint against the plaintiff and the others was dismissed on motion of the United States Attorney. The plaintiff continued to work for the defendant.

The trial court apparently rested its judgment on both malicious prosecution and slander. One of the four elements of malicious prosecution is that a criminal proceeding has been instituted by the defendant against the plaintiff. That requirement was not fulfilled in this case. We have repeatedly held that where a defendant merely gives information to the proper government official and the latter, on his own initiative and without any inducement or request by the defendant, files a complaint against the plaintiff, the latter has no cause of action for malicious prosecution against the defendant. *Jiménez* v. *Sánchez*, 76 P.R.R. 347; *Torres* v. *Marcano*, 68 P.R.R. 813; *Rivera* v. *Casiano*, 68 P.R.R. 177; *Jiménez* v. *Sánchez*, 60 P.R.R. 406; Prosser on Torts, pp. 860, 864–6. See *Fonseca* v. *Oyola*, 77 P.R.R. 496. And that is exactly what occurred here.

The next question is whether the plaintiff is entitled to damages for slander. As already noted, the facts as to this point are as follows: The plaintiff, Wesley, and Olsip were walking toward the office where Wesley and the other F.B.I. agent were to conduct the investigation. Olsip, in the presence of Wesley, pointed to the plaintiff and said: "This is the only way to stop pilferage." To impute pilferage to a person is to charge him with the commission of a crime, which is slanderous *per se* under our statute. Section 3 of the Act establishing the actions of libel and slander, Code of Civil Procedure, 1933 ed., p. 309; *Díaz* v. *P.R. Ry., Light & Power Co.*, 63 P.R.R. 776, 778–9, and cases cited; *Moraza* v. *Rexach Sporting Corp.*, 68 P.R.R. 433, 436–7, and cases cited. But was Olsip's statement a charge that the plaintiff had committed a crime? A statement which is alleged to be slanderous must be examined in

the context of all the other circumstances. *Moraza* v. *Rexach Sporting Corp.*, supra p. 437; Prosser, *supra*, p. 790. It must be remembered that at no point—either prior, during or after the F.B.I. investigation in the office at the dock—did Olsip, Fortunatti, or any other official of the defendant accuse the plaintiff or any other person of theft or of any other crime. On the contrary, the record shows that once the question arose as to whether a crime had been committed, Fortunatti and Olsip—without accusing anyone—immediately communicated with the F.B.I. agents, who conducted their own investigation and thereafter filed a complaint entirely on their own initiative. It is therefore difficult to believe that Olsip's statement "This is the only way to stop pilferage" was a charge that the plaintiff had committed a crime. Such an interpretation would be wholly inconsistent with everything else Olsip and Fortunatti said and did during the incident. Olsip was talking about stopping pilferage on the docks, which was a matter of serious concern to the defendant and all other shipping companies.[1] And Olsip said "this" was the only way to stop such pilferage. What was Olsip referring to when he used the somewhat ambiguous word "this"? It seems to us that he was referring to what was about to begin: immediate and vigorous investigation on the scene by the F.B.I. of seemingly suspicious circumstances. It is true that Olsip pointed at the plaintiff. But the latter could not reasonably object if he and all the others concerned in the matter were investigated. Indeed, he readily assented thereto. We therefore cannot say that under the circumstances of this case the plaintiff established by a preponderance of the evidence that employees of the defendant slandered him by imputing a crime to him. We therefore never reach the question of whether

[1] See *Labor Relations Board* v. *N.Y. & P.R. SS. Co.*, 69 P.R.R. 730, 747, citing Findings and Resolutions of the Grand Jury of the District Court of the United States for Puerto Rico, In re: Investigation of Thefts and Pilferage from Interstate Shipments, filed November 1, 1944.

Olsip's statement, made only to a Federal law enforcement official, was conditionally privileged. *Cf.* § 4, par. 3 of the Act establishing the actions of libel and slander; *Díaz* v. *P.R. Ry., Light & Power Co., supra,* p. 783; *Irizarry* v. *Porto Rico Auto Corp.,* 60 P.R.R. 1.

■ Although the trial court says nothing about false arrest in its conclusions of law, its findings of fact contain the statement that ". . . the action of the employees of the defendant culminated in the slander, arrest and illegal imprisonment of the plaintiff." As to the question of false arrest, we have seen that the defendant's employees had no intervention in the complaint and arrest. The warrant of arrest was issued as the result of the complaint filed by Wesley, the F.B.I. agent, who also conducted the investigation. The complaint was subsequently dismissed on motion of the United States Attorney, who apparently concluded as already indicated that in the absence of the plaintiff 10 extra tins had been loaded on the truck due to a miscalculation made in good faith by Quiñones, the owner of the truck. Wesley may have therefore acted too hastily—and perhaps unjustifiably—in filing the complaint and obtaining the warrant of arrest. But his conduct in that respect cannot be imputed to the defendant's employees who did not request or instigate it. *Turner* v. *Mellon,* 257 P.2d 15 (Cal., 1953); *cf.* VI Ala.L.Rev. 325.

The judgment of the Superior Court will be reversed and a new judgment entered dismissing the complaint.

Mr. Justice Belaval dissented.