[S. F. No. 18755.   In Bank.   May 15, 1953.]

ALBERT TURNER, Appellant, v. TEVIS MELLON et al., Defendants; WESTERN UNION TELEGRAPH COMPANY (a Corporation), Respondent.

William J. Connolly for Appellant.

Pillsbury, Madison & Sutro, John A. Sutro, Francis N. Marshall and Harry C. Scott for Respondent.

SCHAUER, J.—Plaintiff sued Tevis Mellon and Western Union Telegraph Company, Mellon's employer, for false arrest and false imprisonment. A jury returned its verdict in favor of plaintiff as against both defendants. The motion of defendant Mellon for judgment notwithstanding the verdict was denied and that of defendant Western Union was granted. Plaintiff appeals from the ensuing judgment in favor of Western Union; Mellon has not appealed from the judgment against him. We have concluded that the judgment appealed from should be affirmed.

Although, as will hereinafter appear, the trial court should have granted Mellon's motion for judgment notwithstanding the verdict, Mellon's failure to appeal does not prevent our examining the correctness of the finding that he was liable, for any liability of Western Union would necessarily depend upon whether its agent Mellon committed a tort ''in and as a part of the transactions of the business of the agency'' (*Deevy* v. *Tassi* (1942), 21 Cal.2d 109, 125 [130 P.2d 389]), and Western Union, defending on appeal the judgment in its favor in the action in which the liability of Mellon was first placed in issue, is not precluded from disputing every element of that liability.

Mellon was branch manager of a Western Union office on the street floor of the Sheldon Building in San Francisco. His hours of employment were from 2 p. m. to 10:30 p. m. After 6 p. m. he was the only employe on duty in the office. During the three months prior to April 8, 1949, the date of plaintiff's arrest, Mellon had been robbed of company funds on four occasions, by the same person, at hours varying from 5:20 to 10:15 p. m. Mellon had been expressly and repeatedly instructed that his duties included the safeguarding of com-

pany funds; a company bulletin stated that upon discovery of a theft of such funds a manager should "Notify the local police authorities and secure their co-operation in finding the thief." Mellon or his superintendent reported each of the four robberies to the police. After the fourth robbery the superintendent arranged for installation of an alarm system to summon the police, and plainclothes men were stationed in the building each night after 6 p. m.

On April 8 at about 2:30 p. m. Mellon observed plaintiff walk past the Western Union office, then retrace his steps and, according to Mellon's answer, "evince an unusual interest in the premises." The jury impliedly found, on sufficient evidence, that plaintiff, on legitimate business, was looking for the office of a firm which was in the Sheldon Building. Plaintiff, according to Mellon, "looked very much like the man that had been holding me up." Mellon telephoned the police and reported, "I saw the robber pass the office, or a man that looked like him." Mellon got into the police car with the officer who first arrived, rode along Market Street for about half a block, saw plaintiff, and said, "There is the man I was speaking of." A number of other officers arrived. According to Mellon, "never at any time did I positively identify him [plaintiff]. I told them he resembled the man very much." But according to plaintiff, Mellon in responding to an officer's statement, "If he is who you think he is, we will take him," said, "Yes, that is the man."

Plaintiff was arrested, taken to jail, and held until the next day. Mellon then talked with and carefully observed plaintiff and described the ensuing events as follows: "They [the police] told me to sign the complaint, if I was positive of the identification. . . .

"Q. But you got a good close look at him this time? A. Yes.

"Q. And you were convinced it wasn't the man? A. I wasn't one hundred per cent convinced, because there was such a striking resemblance.

"Q. Did you ask him to say anything? A. Yes.

"Q. To identify his voice? A. That's right.

"Q. Did you ask him to turn in different positions? A. That is right.

"Q. And after that was done, you weren't sure, is that right? A. That is right.

48

"Q. And you didn't sign a complaint? A. No, sir. . . . I decided that, as long as there was some doubt in my mind about him being the man, I would rather not make a mistake."

Plaintiff was then released. Two nights later Mellon was again robbed by the same person who had committed the four previous crimes. Shortly thereafter Mellon resigned his position with Western Union because he "couldn't stand the suspense."

It is settled law "that the defendant must have taken some active part in bringing about the unlawful arrest and that he is not liable if, acting in good faith, he merely gives information to the authorities. [Citations.] . . . [I]t would be unjust to impose liability for an honest mistake in identification even where the identification may have been the principal cause of the wrongful arrest." (*Hughes* v. *Oreb* (1951), 36 Cal.2d 854, 859 [228 P.2d 550].) As is pointed out in *Miller* v. *Fano* (1901), 134 Cal. 103, 107 [66 P. 183] (and also in the Hughes case, *supra*), "it would be a hard and unjust law that would hold a party responsible in damages for false imprisonment for an honest mistake as to the identity of a party." All that Mellon did here was to report the commission of the crimes and state to the police officers his honest but mistaken opinion that plaintiff was the robber. This conduct did not in law amount to taking "some active part in bringing about the unlawful arrest," and since Mellon did not participate in the false imprisonment neither he nor his employer, whose only liability would necessarily rest on the doctrine of *respondeat superior,* is liable therefor.

Plaintiff relies upon *Turner* v. *Elliott* (1949), 91 Cal.App.2d 901, 904 [206 P.2d 48], wherein understandable and commendable concern is shown for the victims of mistaken identification and ensuing false arrest. We share this concern but we think that proper concern for the victim in such a case must stop at some point along the line where to support his claims further would contravene the public interest. We think it serves the public interest—and, hence, the line should be drawn here—that citizens who have been criminally wronged may, without fear of civil reprisal for an honest mistake, report to the police or public prosecutor the facts of the crime and in good faith, without malice, identify to the best of their ability to such public officers the perpetrator of the crime. Investigation and action from then on are the responsibility of the public employes who are skilled in

that work and who are paid to perform it. The victims of crimes should not be held to the responsibility of guarantors of the accuracy of their identifications.

The Turner case, as indicated above, was a false arrest action and in it judgments for plaintiffs were affirmed upon the stated ground that the defendant actively participated in the arrests because the evidence showed that he "was a victim of the robbery, caused the police to be summoned, pointed out [plaintiffs] Butcher and Moore, stated that they were the men who had robbed him, and when [plaintiff] Turner interceded he directed the officers to arrest Turner also. Without his activities there would have been no identification of the plaintiffs and no arrests." The Turner case purports to distinguish the Miller case (1901), *supra*, 134 Cal. 103, upon the ground that the facts in Miller "bear no resemblance to the circumstances of the arrests of plaintiffs herein." While there are differences between the facts of the two cases, at least in respect to Turner, there are also implications in the above quoted language of the Turner case which are contrary to the Miller case and also to the Hughes case. Such contrary implications of the Turner case are disapproved. A view contrary to that of the Miller and Hughes cases would, we think, inevitably tend to discourage a private citizen from imparting information of a tentative, honest belief to the police and, hence, would contravene the public interest which must control.

Plaintiff also relies upon *Nelson* v. *Kellogg* (1912), 162 Cal. 621, 624 [123 P. 1115, Ann.Cas. 1913D 759], where it is said that "the defense of probable cause is not applicable in actions for false imprisonment." In view of our conclusion that Mellon's conduct, as a matter of law, did not amount to participation in the arrest, we do not reach the question of probable cause. Our conclusion also obviates the need for discussion of the question whether Mellon was acting in the scope and course of his employment so as to render Western Union liable for his acts.

For the reasons above stated the judgment appealed from is affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., and Spence, J., concurred.

CARTER, J.—I dissent.

On the theory that bad court decisions like bad kings are good for us if they are bad enough, the majority decision

in this case casts ominous shadows of such dire consequences in the realm of human rights and the dignity of man that those who believe in the American concept of liberty and justice may rise in defense of that concept and become so articulate that decisions such as this cannot stand as the law of this state.

There can be no doubt that under the rule here announced, the right of the individual to the enjoyment of life, liberty and the pursuit of happiness is not only abridged, it is destroyed. The right of a person who has done no wrong—violated no law—injured no one—to walk along a public street in a dignified, respectable manner without fear of arrest and imprisonment no longer exists in this state. The dignity and security of the individual citizen is subordinated to the whim and caprice of any fanatical overzealous person who chooses to point a finger of suspicion at him and thereby cause his arrest and imprisonment without written charge, complaint or warrant of arrest.

The concept of the majority appears to be that the detection of crime and apprehension of criminals is of greater importance to society than the right of innocent, law-abiding persons to live in peace and security and be free from arrest and imprisonment unless there is reasonable and probable cause for the belief that such person has committed a crime. This concept is diametrically opposed to that on which this government was founded and is akin to the totalitarian concept that the citizen is a mere pawn of the state and all his rights must yield to what may be considered in the interest of the state—hence, he may be arrested and imprisoned without probable cause and is entitled to no redress for the injury suffered as the result of the ignominious indignity inflicted upon him.

The majority opinion is not supportable on any theory therein advanced or otherwise. It fails to give sensible meaning to what constitutes actively participating in the arrest, confuses that question with good or bad faith and probable cause, omits facts in the record and those found by the jury, and is based upon a philosophy and policy wholly foreign to the fundamental principles of our government.

Looking at the facts, we find defendant Mellon, employee of defendant corporation, was acting in the course of his employment when he actively procured plaintiff's arrest. That he acted in the course of his employment is clear from the able and learned opinion of Mr. Justice Fred Wood, speaking

for the District Court of Appeal when the case was there decided. (See *Turner* v. *Mellon*, (Cal.App.) 249 P.2d 41.) Plaintiff on entirely legitimate business walked by Western Union's premises and then returned and passed there again. Mellon, the employee, saw him and notified the police. The police responded to his call and he joined them in their patrol car and directed them down the street where plaintiff was walking. Mellon pointed out plaintiff as the person who had robbed him before. As the result of Mellon's assurances the police arrested plaintiff and took him to the police station. There again Mellon positively identified plaintiff as the robber of the Western Union office on four previous occasions. Mellon had described the person who had previously robbed him as being "5 feet 11 inches" tall, weighing 150 pounds, and age 28. Plaintiff, on the other hand, was 6 feet and ¼ inch tall and weighed 130 pounds, and was 39 years of age. Moreover, the jury had the opportunity of observing plaintiff on the stand and thus comparing the appearance he made with that given by Mellon of the robber. The four previous robberies had all occurred between 8 and 9 p. m., while Mellon's observation of plaintiff just before the arrest was at 2:30 p. m. There was nothing unusual or suspicious about the actions of plaintiff at the time Mellon observed and identified him. I mention these factors because they supply an adequate basis upon which the jury could decide, as it did, that Mellon was acting either in bad faith or without probable cause.

There can be no doubt that Mellon procured, actively participated in and brought about plaintiff's arrest. On observing plaintiff walking along the street, he called the police. He directed them to the point where he had last seen plaintiff. He pointed plaintiff out as the person who had perpetrated the robberies. When the officers were reluctant to make the arrest, he assured them that plaintiff was the robber and on that basis *alone* the arrest was made. If that does not constitute a participation in the arrest—the procuring cause of it—then it is difficult to imagine a case that would. In *Hughes* v. *Oreb* [36 Cal.2d 854 (228 P.2d 550)], the defendant did nothing more than, in good faith, give information to the arresting officers. Here the evidence shows that Mellon was the *sole* procuring cause of plaintiff's arrest. The officers would not have arrested plaintiff except for Mellon's false but positive identification.

The majority opinion, however, *concludes as a matter of law,* repudiating the jury's contrary finding, that Mellon did not participate in the arrest. It makes that determination by giving to the participation element a meaning that ordinarily would be ascribed to probable cause. The latter factor, by that name, is said to be not involved because there was *no* participation in the arrest by Mellon. It first states the rule iterated in *Hughes* v. *Oreb, supra,* 36 Cal.2d 854, 859 [228 P.2d 550], that: "the defendant must have taken some active part in bringing about the unlawful arrest and that he is not liable if, acting in good faith, he merely gives information to the authorities . . . every person is entitled to give information to the proper officers and that it would be unjust to impose liability for an honest mistake in identification even where the identification may have been the principal cause of the wrongful arrest." Then, it concludes that Mellon's actions were in good faith, an honest but mistaken opinion as to identity and therefore he did not take an "active part in bringing about the unlawful arrest." If the last quoted words are to be given a meaning that has any resemblance to their real sense, it is a *non sequitur* to state that a person did not take an active part in procuring the arrest of a person because he acted in good faith. His activity could be with good or bad faith but nevertheless be activity. Manifestly the majority is, by giving a completely foreign meaning to those words, using them to declare a public policy against holding a person liable for actively participating in an unlawful arrest where he acts honestly (later I will discuss the policy question) or, although it says probable cause is not involved, it is speaking of the same principle but calling it no participation because of good faith. In any event, as I have above pointed out, there was adequate evidence to show active procurement of the arrest and also bad faith, even accepting the terminology of the majority opinion. On the evidence the jury found the facts on those issues and this court cannot disturb that finding without thereby denying plaintiff's right to a jury trial, which it has done here.

For cogent reasons the majority has excluded the issue of probable cause from its consideration. It is a vital issue in this case as it is in every case of false arrest. It must be conceded that any person who has probable cause to believe that a crime has been committed and that he knows the person guilty thereof, should report such facts to peace

officers to the end that persons who violate the law should be apprehended and punished. Probable cause has been defined as a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious person in the belief that the person accused is guilty of the offense with which he is charged. The determination of what constitutes probable cause is and should be a question of fact. Therefore, the issue in this case was whether or not defendant Mellon had probable cause to believe that plaintiff had committed the four robberies of which defendant Mellon was aware. In determining whether or not defendant Mellon had probable cause to believe that plaintiff had committed said robberies, the trier of fact was required to consider all the facts in order to determine whether or not defendant Mellon acted as a reasonable and prudent person in identifying plaintiff as the robber and directing the police to arrest him. It must be assumed that the jury, as the trier of fact in this case, gave consideration to this issue and determined it adversely to defendant Mellon. Certainly every citizen who walks upon the street should not be subjected to the whim and caprice of the fanatical, irrational person who might identify him as the perpetrator of a crime and subject such a person to arrest and imprisonment. Some standard should be adopted to protect innocent, law-abiding people from arrests of this character, and the only standard known to the law is that of probable cause. By refusing to consider this issue as an essential element in determining the reasonableness of the conduct of defendant Mellon in this case, the majority of this court has disregarded the only standard known to the law for the protection of innocent persons from unjustified arrests in cases such as this.

*Turner* v. *Elliott*, 91 Cal.App.2d 901 [206 P.2d 48], overruled by the majority opinion is precisely in point and sound law. The facts there are practically identical with the facts in the instant case and the court upheld the jury's verdict for plaintiff. (See cases to the same effect, 21 A.L.R. (2d) 643, 710.)

As heretofore mentioned, the basic premise of the majority opinion is that to hold a person liable who by false identification procures the arrest and imprisonment of another would ''contravene public interest.'' The nature of the public interest or policy is not elucidated but it is not hard to discern. It is the policy of making it easier for the police to catch alleged criminals even at the expense of the innocent by false im-

prisonment. That policy is and should be subordinate to the fundamental rights of individual freedom—principles which are imbedded in our Constitutions, state and federal. The policy declared by the majority makes the rights of individuals expendable on the chance that more criminals may be apprehended. The framers of the Constitution of the United States weighed that policy against those rights and took the calculated risk in favor of the latter. These principles have been enunciated repeatedly. In considering coerced confessions, it has been said, "The rule [that confessions obtained for one crime while defendant was held in custody for another could validly be used at the trial for the first crime] I propose would, of course, reduce the 'efficiency' of the police. But so do the requirements for arraignment, the prohibition against coerced confessions, the right to bail, the jury trial, and most of our other procedural safeguards. We in this country, however, early made the choice—that the dignity and privacy of the individual were worth more to society than an all-powerful police." (*United States* v. *Carignan,* 342 U.S. 36, 46 [72 S.Ct. 97, 96 L.Ed. 48], Douglas, J. dissenting; Black, J. and Frankfurter, J. joining.) It is forcefully put by Mr. Justice Black in *Chambers* v. *Florida,* 309 U.S. 227, 240 [60 S.Ct. 472, 84 L.Ed. 716], also dealing with coerced confessions: "We are not impressed by the argument that law enforcement methods such as those under review are necessary to uphold our laws. The Constitution proscribes such lawless means irrespective of the end. And this argument flouts the basic principles that all people must stand on an equality before the bar of justice in every American court. Today, as in ages past, we are not without tragic proof that the exalted power of some governments to punish manufactured crime dictatorially is the handmaid of tyranny. Under our constitutional system, courts stand against any winds that blow as havens of refuge for those who might otherwise suffer because they are helpless, weak, outnumbered, or because they are nonconforming victims of prejudice and public excitement. Due process of law, preserved for all by our Constitution, commands that no such practice as that disclosed by this record shall send any accused to his death. No higher duty, no more solemn responsibility, rests upon this court, than that of translating into living law and maintaining this constitutional shield deliberately planned and inscribed for the benefit of every human being subject to our Constitution—of whatever race, creed or persuasion." The same thoughts have been

expressed in cases dealing with arrests and searches and seizures. In *United States* v. *Di Re*, 332 U.S. 581 [68 S.Ct. 222, 92 L.Ed. 210], Mr. Justice Jackson said at page 595: "We meet in this case, as in many, the appeal to necessity. It is said that if such arrests and searches cannot be made, law enforcement will be more difficult and uncertain. But the forefathers, after consulting the lessons of history, designed our Constitution to place obstacles in the way of a too permeating police surveillance, which they seemed to think was a greater danger to a free people than the escape of some criminals from punishment. Taking the law as it has been given to us, this arrest and search were beyond the lawful authority of those who executed them. The conviction based on evidence so obtained cannot stand." To the same effect is the declaration of Mr. Justice Douglas in *McDonald* v. *United States*, 335 U.S. 451, at page 455 [69 S.Ct. 191, 93 L.Ed. 153]: "We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals. Power is a heady thing; and history shows that the police acting on their own cannot be trusted. And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." The principles thus declared are not new. In 1920, the late Mr. Justice Clarke, speaking for a unanimous court in *Gouled* v. *United States*, 255 U.S. 298, at page 303 [41 S.Ct. 261, 65 L.Ed. 647], said: "It would not be possible to add to the emphasis with which the framers of our Constitution and this court (in *Boyd* v. *United States*, 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746], in *Weeks* v. *United States*, 232 U.S. 383 [34 S.Ct. 341, 58 L.Ed. 652], and in *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319]), have declared the importance to political liberty and to the welfare of our country of the due observance

of the rights guaranteed under the Constitution by these two Amendments [Fourth and Fifth]. The effect of the decisions cited is: that such rights are declared to be indispensable to the 'full enjoyment of personal security, personal liberty and private property'; that they are to be regarded as of the very essence of constitutional liberty; and that the guaranty of them is as important and as imperative as are the guaranties of the other fundamental rights of the individual citizen,—the right to trial by jury, to the writ of *habeas corpus*, and to due process of law. It has been repeatedly decided that these Amendments should receive a liberal construction, so as to prevent stealthy encroachment upon or 'gradual depreciation' of the rights secured by them, by imperceptible practice of courts or by well-intentioned but mistakenly over-zealous executive officers.'' While those cases were dealing with unlawful acts of public peace officers, the fundamental principles are nevertheless relevant to the question of when civil liability should be imposed on an individual who unlawfully procures the arrest and imprisonment of another and thus causes those rights to be violated. In both cases, the person is unlawfully deprived of his liberty and for that he should be compensated. Indeed, the argument has been made many times by the proponents of the view that illegally obtained evidence cannot be excluded at the trial in the state courts, that the offended person has his civil remedy for damages, the clear implication being that that remedy is adequate. The majority opinion in this case demonstrates not only the inadequacy of such a remedy but concludes there is no remedy at all.

Finally, I wish to state without qualification or reservation that in my opinion the inalienable rights to the enjoyment of life, liberty and the pursuit of happiness guaranteed to all persons by our fundamental law are so precious that they constitute the *sine qua non* of the American way of life, and that any intrusion on or abridgement of those rights should not be tolerated by judges who have taken a solemn oath to support the Constitution of the United States and the Constitution of the State of California; that a heavy burden should be cast upon the person who sets in motion any action or proceeding which results in a violation of such rights to justify his action; that the only justification of such an action or proceeding is that the person instigating the same has reasonable and probable cause to believe that the person whose rights are being invaded is guilty of a public offense;

and that in the absence of a showing of the existence of reasonable and probable cause for the instigation of such action or proceeding, the person instigating the same should be liable in civil damages to the person injured regardless of the honesty or good faith of the instigator. If such a rule were announced by this court in this case, the judgment notwithstanding the verdict, rendered by the trial court would be reversed. In my opinion that should be the decision of this court.

Appellant's petition for a rehearing was denied June 11, 1953. Carter, J., was of the opinion that the petition should be granted.