Edward A. KNUPP, Respondent,

v.

Jeannettie ESSLINGER, Appellant.

No. 23522.

Kansas City Court of Appeals.
Missouri.

Dec. 3, 1962.

John H. Foard, Tom J. Helms, Kansas City, for appellant.

Albert J. Yonke, Kansas City, for respondent.

CROSS, Judge.

Plaintiff sues for damages resulting from an alleged false arrest and imprisonment instigated by defendant. The amount prayed for is $15,000.00. The case was tried to a jury upon the pleaded averment that "defendant * * * unlawfully caused plaintiff to be arrested and taken into cus-

tody and thereafter to be imprisoned and placed in the City Jail * * *". The jury returned a verdict in defendant's favor. Thereafter the trial court sustained plaintiff's motion for a new trial on the ground that the verdict was against the greater weight of the credible evidence, and, in the alternative, on grounds that the verdict was against the law and the evidence and resulted from improper deliberations by the jury. Defendant has appealed from the trial court's order and judgment setting aside the jury's verdict and granting plaintiff a new trial.

■ It is conceded by both parties that the only question on this appeal is whether the trial court erred in granting a new trial on the ground that the verdict was against the greater weight of the credible evidence. In resolving this question, we use the same test that would be applied in determining whether there was substantial evidence to submit plaintiff's case to the jury as against the defendant's motion for a directed verdict, Hoefel v. Hammel, Mo. App., 228 S.W.2d 402. Our function is limited to a review of the record to ascertain "only if there was substantial evidence to warrant a verdict for the party in whose behalf the motion was sustained". Andres v. Brown, Mo., 300 S.W.2d 800. "It cannot be said that there is an abuse of the vested discretionary power if there is any evidence on which a jury might, upon retrial, bring in a valid verdict contrary to the one returned". Westinghouse Electric Supply Co. v. Binger, Mo.App., 212 S.W.2d 445.

■ In determining whether there was sufficient evidence to take plaintiff's case to the jury, we must assume the truth of every fact and circumstance in plaintiff's favor that has been shown in evidence, whether by plaintiff or defendant, and accord plaintiff the benefit of all reasonable inferences which may fairly be drawn therefrom. All evidence, and inferences unfavorable to plaintiff will be disregarded. Under the

limitations thus prescribed, we set out applicable portions of the evidence.

Plaintiff is a professional musician. Some time in March, 1958, he was employed by a bandleader to play the trumpet in a band playing an engagement at a drinking establishment in Kansas City known as "Smith's Bar". Defendant formerly operated the business, but had leased it under a purchase agreement to another woman prior to the time in question. Defendant's real name is Jeannettie Esslinger, but she is known generally as Betty Smith.

On the night of March 15, 1958, plaintiff arrived at Smith's Bar some time before 9 o'clock. When he walked in he spoke to defendant, who was there present, passed the time of day, and proceeded to the area where the band would play. He recognized defendant because he formerly played in a band which had a short engagement in the bar when she was operating it in 1946 or 1947. However, plaintiff had not seen her since that time until the occasion in question. Defendant spoke in return but apparently didn't recognize plaintiff's identity, inasmuch as she came over to the bandstand and asked him what his name was. Plaintiff stated that "She asked me if I had given her a bad check a couple of years before and I told her I didn't give her any check, that I didn't write any checks". Plaintiff further testified that he never had written a bad check to defendant or to any one else. There is no evidence in the case to that effect.

After the above narrated conversation, and before police officers arrived at the bar later in the evening, as will hereinafter appear, defendant made a telephone call to the Sheffield Police Station. The only testimony bearing on the purpose of the call and the subject matter of the conversation with the answering police officer comes from defendant herself. That testimony is not clear or unequivocal. On direct examination she stated, "I called the Police Department and asked the Police Depart-

ment to come out and check the man, that I had seen either his picture some place— I just asked them to come out and check the man, that I had had trouble with him before, or I had seen his picture at Police Headquarters, and I was afraid of the man, whoever he was". She agreed that he was "just an image in—(her)—mind". On cross examination she said that when she called the police they said, "What is the trouble, Betty?", and that she replied, "I don't know; I have seen this gentleman's face somewhere. I have been told for him not to be in my bar. I don't know whether it is in regards to a check, or what he did, but that is something I have tied in with him, but please just come out and talk to the gentleman". In connection with the foregoing testimony of defendant, it is of significance that some time prior to her telephone call to the police station a man named Kidoo had given her a bad check. She admitted there was some question in her mind about whether plaintiff was that man.

Two police officers, George Carey and Francis Clemons, were dispatched to and arrived at Smith's Bar between eleven and eleven-thirty P.M. Clemons went inside the premises "maybe a minute" before Carey entered, and talked to defendant. This conversation was not heard by Carey who, as the driver of the patrol car, had remained behind long enough to park the car, pull the keys out, and lock up the "guns". The only witness who testified about the conversation between Clemons and defendant was the defendant herself. She denied that she requested or directed the officers to arrest plaintiff and testified that the only statement she made to Clemons was "Check that man", after pointing out plaintiff. She denied that she told him anything about having a bad check issued by plaintiff. There is no testimony from Clemons to show what defendant said to him because he died before the case came to trial.

After the conversation between Clemons and defendant, Carey rejoined Clemons and, together, the two officers went to the bandstand, where plaintiff was playing. They called him aside and placed him under arrest without any written complaint, warrant or pick-up order. Carey testified (for defendant), "We had an order to make an investigation and to pick up this party, and for what reason I wouldn't know. * * * Actually we just had an order to check him, I suppose". He also stated that he didn't know "who" he was looking for until after he got there, but that Clemons did; "probably". The officers took plaintiff out the front door, put him in the patrol car and took him to Sheffield Station. Defendant was still present in the bar and witnessed the arrest without comment.

Carey identified the original police report of the arrest. It was in the handwriting of Clemons, who had prepared it "immediately at the time of the arrest". It appears that the report was made at Sheffield Station upon the arrival of the officers there with plaintiff in their custody. The only statement contained in the report relative to the reason for plaintiff's arrest is "Subject issued worthless check to Betty Smith, former owner of the Smith's Bar". Officer Carey stated that Officer Clemons already had "knowledge about this subject issuing a worthless check" when they arrived at the Sheffield Station. As we have noted above, defendant denied that she told Clemons plaintiff had given her a bad check. She further testified that when Clemons wrote "Subject issued a worthless check to Betty Smith" she didn't know where that information came from.

After the report was made "they" took his personal effects from him and denied him the privilege of calling his wife or an attorney. He was taken into a room and questioned as to whether he had passed "a check or a bunch of checks." He denied accusations to that effect. After that interview, he was placed and kept in a cell for some time.

He was later removed and taken downtown to the main police station at 12th and

Locust. Some time after 2:00 A.M., he was fingerprinted, photographed, booked and put in the bull pen, where he remained the rest of the night. The next morning they "pulled me out and run me through the line-up". After that experience, plaintiff was taken into another room and questioned specifically about writing a bad check to Betty Smith or Betty Esslinger. Plaintiff again protested that he had never done so. The police released plaintiff about noon on the day following his arrest (Sunday). He had been held in jail about 12 or 13 hours.

At an undisclosed time on Sunday, defendant called the police department and inquired what they had found out about plaintiff. Defendant testified that she asked of the officer, "Have you found out about this bad check?" and that he said "Yes, we have the man in jail that gave you one check". That man was Mr. Kidoo. It is not shown whether plaintiff was then still in jail or had been released.

■■■ It is thoroughly settled law that a person is liable for a false arrest made by another if he "directed, advised, countenanced, encouraged, or instigated" such arrest. Snider v. Wimberly, 357 Mo. 491, 209 S.W.2d 239. In order to establish a case of false arrest it is not necessary that plaintiff prove that defendant actually ordered or directed his arrest, but he may make his case by showing that defendant merely instigated it. "Furthermore, such fact may be shown either by direct or by circumstantial evidence". Thompson v. Fehlig Bros. Box & Lumber Co. et al., Mo.App., 155 S.W.2d 279, and cases cited.

■■ In view of the foregoing legal principles, we believe that from the above noted facts and circumstances found in the record the jury could reasonably infer, not only that defendant countenanced, encouraged, advised and instigated plaintiff's arrest, but that she actually directed such action on the part of .the police officers. Consequently, we rule that plaintiff made a submissible case, and that, therefore, the

trial court committed no error in granting plaintiff a new trial on the ground that the verdict was against the greater weight of the credible evidence. This determination has been made after due consideration of the authorities cited by defendant. Those cases have slight relevance to the issue involved here because they necessarily involve facts different from those found in this case. No fixed set of rules can be laid down with which to measure acts constituting instigation of an arrest, for the reason that each case must be decided on the particular facts thereof and the inferences to be drawn therefrom. 35 C.J.S. False Imprisonment § 38, p. 687.

The judgment is affirmed and the cause is remanded for a new trial in accordance therewith.

All concur.