743 P.2d 961

**David G. DEADMAN, a single man, Plaintiff-Appellee,**

v.

**VALLEY NATIONAL BANK OF ARIZONA, a federal bank, Defendant-Appellant.**

**No. 1 CA–CIV 8953.**

Court of Appeals of Arizona, Division 1, Department D.

Sept. 29, 1987.

Brenda K. Warneka, Phoenix, and Vincent D. Maggiore, Scottsdale, for plaintiff-appellee.

Mohr, Hackett, Pederson, Blakley, Randolph & Haga, P.C. by Michele M. Feeney, William C. Blakley, Phoenix, for defendant-appellant.

## OPINION

BROOKS, Judge.

This is an appeal from a judgment entered upon a directed verdict, holding defendant, Valley National Bank, liable to plaintiff, David G. Deadman, for false arrest. The bank also appeals from the denial of its motion for a new trial or for judgment notwithstanding the verdict, as to the amount of damages awarded by the jury.

Phoenix police officers arrested Deadman in the lobby of the bank's Paradise Valley Mall branch after a bank employee called police to report her belief that Deadman was attempting to use a fraudulent credit card. The officers detained Deadman for half an hour and then released him when it was determined that his credit card was valid.

The dispositive question on appeal is whether either party was entitled to judgment as a matter of law on the issue of the bank's liability for instigating Deadman's wrongful arrest. Because we believe that the matter was one for the jury to decide, we remand for further proceedings.

### FACTS AND PROCEDURAL HISTORY

The relevant facts are not in dispute. Around July 15, 1982, while staying with relatives in Scottsdale, Arizona, Deadman, then a Michigan resident, arranged to buy a truck. The seller allowed Deadman until the following Saturday afternoon to pay for it. Before 9:00 a.m. on Saturday, July 17, 1982, Deadman joined others waiting for the Paradise Valley Mall branch of the Valley National Bank to open for business. Deadman was dressed in cutoff jeans, a tank-top shirt, tennis shoes, and a baseball cap.

Once inside the bank, Deadman asked teller Leslie Bertram for a $2,000 cashier's check payable to the seller of the truck. Deadman gave Bertram his Michigan driver's license and his Merrill Lynch VISA card. The license had Deadman's picture and signature on it. The VISA card, which also bore Deadman's signature, permitted direct withdrawal of money from his account with Merrill Lynch, which contained more than $2,000.

Bertram tried to get authorization for the transaction, but was unable to get through to the computer by telephone. She went to Pam Barrett, the branch operations manager and acting supervisor, and explained the situation. Bertram thought that there might be some problem with her pass code because she was working at the Paradise Valley Mall branch only temporarily. When Bertram telephoned again for computer authorization, this time using Barrett's pass code, a woman answered and told her that there was some trouble with the computer. The woman said that she would go to another room to get the authorization and would then call Bertram back. Bertram told Deadman that there would be a delay in processing his transaction. She testified that the possibility that Deadman's card was fraudulent had never crossed her mind; nothing about the transaction aroused her suspicions.

Meanwhile, Barrett received a telephone call from Irma Chavez, the operations supervisor at the bank's Metrocenter branch. The night before, someone at the Metrocenter branch had telephoned Barrett to ask her to read one of the bank's warning bulletins over the telephone. The bulletin concerned a gang that was operating in the Phoenix area using stolen or forged credit cards to obtain cash advances. The purpose of Chavez' telephone call that morning was to bring Barrett up to date on the

events of the previous night, when a man had come into the Metrocenter branch near closing time and had asked for a $2,000 cash advance. He had presented an out-of-state license and credit card. The credit card had proved to be fraudulent, and police had arrested the man.

As she spoke with Chavez, Barrett had Deadman's driver's license, credit card, and signed cash advance form on the desk before her. She became alarmed at the thought that Deadman's card might also be fraudulent. Barrett knew that fraudulent transactions were normally attempted when the bank was least organized and that Paradise Valley Mall and Metrocenter were the only branches open on Saturday mornings. She observed Deadman pacing around and thought he looked nervous. She also believed that he appeared rather young to have a $2,000 line of credit. She testified: "[I]t just looked to me to be the same type of situation that Irma had dealt with the night before, and so the judgment was made to call the police in at that moment."

Barrett testified that before Deadman's arrest, she did not know that the genuineness of a credit card could be tested by scratching the back of the card. Neither did she know whether the bank had a book that listed the numbers of stolen or forged cards. She did know of a backup telephone number that could be used to get authorization on the credit card if communication could not be established using the main number. She did not try to use the backup number before calling the police, however, because she was already on the phone with Irma Chavez. Barrett thought that if she were to hang up, and if Deadman were in fact using a forged card, he might become alarmed and leave the branch. Barrett testified:

And so while I was on the phone with her it was agreed between us that I should remain on the phone with her so as not to alert the customer, because if he was actually a criminal in the branch we didn't want him to leave. We would rather have apprehended him.

Barrett and Chavez therefore agreed that Barrett would stay on the phone to avoid alerting Deadman and that the police would be contacted from the Metrocenter branch. At Chavez' request, Kathy Schoech, another employee at the Metrocenter branch, made the call. The information transmitted to the police was that "the Paradise Valley Mall branch believed that they had a man there presenting some kind of fraudulent credit card." Barrett and Chavez testified that they all wanted the police to get to the Paradise Valley Mall branch as quickly as possible so that the police could "apprehend" the man and find out what was going on.

Barrett testified that the bank had surveillance cameras and that, to the best of her knowledge, they were functioning on the date of the incident. She acknowledged that she might have refused to process Deadman's transaction, taking his picture before he left. In fact, someone did activate the cameras, and pictures of the incident were taken.

While Schoech was in contact with the police, the police dispatcher sent out a "hot call," a two- or three-second radio tone denoting an emergency. The dispatcher then transmitted further information indicating that there was a "forgery in progress" at the Valley National Bank in Paradise Valley Mall; she explained what was being forged and described the suspect and his location within the bank. One of the responding officers testified that he had not asked the dispatcher what proof of forgery there was. He explained:

When we have a crime in progress we would like to get the situation under control first and investigate. Us figuring that a bank is going to call us on a forgery, they have more knowledge of what to look for in a forgery in my assumption than an officer would.

Back at the Paradise Valley Mall branch, Deadman asked Bertram how long he would have to wait for his check. She told him that it would be quite a while. Deadman then left the bank for about five minutes, bought a cup of coffee, and brought it back with him. Again he asked Bertram if

the check was ready. She told him it would take just a little longer. He waited another five or ten minutes before approaching Barrett, whom he thought was trying to get approval for his transaction. She told him it would not be much longer. He continued to wait.

When the officers arrived, Deadman was standing between the teller counter and the new accounts area. One officer, after noting that Deadman matched the description he had just heard over the radio, looked to Barrett for confirmation. She made eye contact with the officer and nodded her head in Deadman's direction. The officers approached Deadman from behind, grabbed his arms, placing them on the counter. The officers frisked Deadman and handcuffed him. The record contains no evidence that any bank employee expressly requested Deadman's arrest, told the officers to frisk or handcuff him, or offered any advice about how to handle the situation.

After taking Deadman into custody, the officers asked Barrett where they could go to talk to him. She directed them to a glass-walled conference room. Deadman testified that as he was being taken to the conference room, he heard Barrett say something like, "we finally caught him."

While one officer questioned Deadman in the conference room, another officer came out to ask Barrett exactly what was going on. Barrett explained to him the bases for her suspicions. The officer asked Barrett whether there was any means of verifying the card. Barrett remembered that there was another number that she could call for verbal authorization on the card. The officer and Barrett called the number and promptly received the verification, at which Barrett was very "shocked." She asked the person on the line if he was sure, and when he asked why, she explained her suspicions to him. He said he would double-check. Several minutes later, he returned to say that he could find nothing wrong and that, as far as he was concerned, she could give Deadman the money.

Barrett then stepped to the door of the conference room, apologized to Deadman, made explanations, and asked if he would still like his money. Deadman was released. He received his $2,000 cashier's check and left. He had spent between fifteen and thirty minutes handcuffed in the conference room.

Deadman sued Valley National Bank, the city of Phoenix, and several individuals, claiming false arrest and false imprisonment, assault and battery, intentional infliction of emotional distress, libel and slander, and violations of his constitutional and civil rights. He sought compensatory and punitive damages. The trial court granted the city's motion for summary judgment on the civil rights and defamation claims. By stipulation, the defamation claim against the bank was dismissed.

The trial court granted the city's motion for a directed verdict on all remaining counts of the complaint. It also granted the bank's motion for a directed verdict on Deadman's claims for intentional infliction of emotional distress, assault and battery, and for punitive damages. It denied, however, the bank's motion for a directed verdict on the false arrest and false imprisonment claim. Instead, on its own motion, the court directed a verdict in favor of Deadman on the issue of liability on that count. The trial judge stated:

I am also compelled to find as a matter of law that the bank acting through its employees was without probable cause to believe that the plaintiff was engaged in a felony. And since it cannot be denied, I don't believe that the arrest that followed was anything but the natural and understandable result of that erroneous belief, and the plaintiff is entitled to a verdict in his favor against the bank for a fair, just compensation....

The issue of damages was submitted to the jury, which awarded $25,000.00 to Deadman.

## DENIAL OF BANK'S MOTION FOR DIRECTED VERDICT

On appeal, the bank contends that the trial court erred in denying its motion for a directed verdict. In determining whether the trial court should have directed a ver-

dict in favor of the bank, we must view the evidence and all inferences that could reasonably be drawn therefrom in a light most favorable to Deadman. *See Bailey v. Montgomery Ward & Co.*, 6 Ariz.App. 213, 431 P.2d 108 (1967).

■ The tort of false imprisonment, a lineal descendant of the old action of trespass, is sometimes called false arrest. *Prosser & Keaton on Torts* § 11 at 47, (5th ed. 1984). The essence of false imprisonment is the direct restraint of personal liberty or freedom of locomotion, either by actual force or the fear of force. *Wisniski v. Ong*, 84 Ariz. 372, 329 P.2d 1097 (1958). *See Restatement (Second) of Torts* §§ 35–45A (1965).

Valley Bank and Deadman agree that the question of the bank's liability for false arrest or false imprisonment is controlled by the principles summarized in *Restatement (Second) of Torts* § 45A (hereinafter § 45A) and the comments thereto. Section 45A states:

> One who instigates or participates in the unlawful confinement of another is subject to liability to the other for false imprisonment.

Comment c states in part:

> *Instigation.* If the confinement is unprivileged, the one who instigates it is subject to liability to the person confined for the false imprisonment. Instigation consists of words or acts which direct, request, invite or encourage the false imprisonment itself. In the case of an arrest, it is the equivalent, in words or conduct, of "officer, arrest that man!" It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them.

Comment d states in part:

> One who instigates a false imprisonment becomes liable as if he had himself done the act causing the confinement. He is not protected by his reasonable belief that the officer or other person

who makes the arrest has legal authority to make it, or that the arrest is fully justified.... Probable cause, which will prevent liability for malicious prosecution, ... is not a defense to an action for false imprisonment.

Comment e states in part:

> *Participation.* One who takes part in a false imprisonment, by aiding another to make it, becomes liable as if he had acted by himself.

*See Sarwark Motor Sales, Inc. v. Woolridge*, 88 Ariz. 173, 354 P.2d 34 (1960); *Prosser & Keaton*, § 11 at 52; 32 Am. Jur.2d *False Imprisonment* § 45 at 99 (1982).

First, the bank denies that it controlled, directed, or otherwise influenced the officers who arrested Deadman or that it instructed them concerning how they should investigate Deadman's possible criminal activity. Instead, the bank asserts, the arresting officers used their own best judgment in investigating and controlling the situation as they perceived it. The bank concludes that it was entitled to a directed verdict on Deadman's claim for false arrest. In essence, the bank contends that its employees neither "instigated" nor "participated" in Deadman's arrest; they merely gave information to the police.

Second, the bank contends that because its own employees did not detain Deadman, the bank may be held liable for false arrest only on a theory of vicarious liability for the actions of the arresting officers. The bank argues that in granting a directed verdict in favor of the city of Phoenix, the trial court necessarily determined that the officers had not falsely arrested Deadman. The bank concludes, therefore, that there is no logical basis on which it could be held liable for the city's detention of Deadman.

■ We address the latter argument first. The bank's reasoning is inconsistent with the principles of § 45A, under which the liability of a person who instigates or participates in an unlawful confinement is not vicarious, but is instead founded upon that person's own conduct. Moreover, an arrest may be privileged as to the police

458

officer who actually effects the arrest and yet be wrongful as to the private citizen who instigates the arrest:

> According to the weight of authority, if an officer makes an arrest without a warrant solely at the request or instigation of a private citizen, the authority of the officer does not protect the citizen and the liability of the latter is determined as though he had made the arrest himself.

Annot., 21 A.L.R.2d 643, § 20, at 688 (1952); *accord* § 45A, comments d & e; *Green v. No. 35 Check Exchange, Inc.*, 77 Ill.App.2d 25, 222 N.E.2d 133 (1966).

In Arizona, a peace officer may make a warrantless arrest when the officer has probable cause to believe that a felony has been committed and that the person to be arrested has committed the felony. A.R.S. § 13–3883(1). However, the circumstances under which a private person may make an arrest are more limited, as described in A.R.S. § 13–3884:

> A private person may make an arrest:
> 1. When the person to be arrested has in his presence committed a misdemeanor amounting to a breach of the peace, or a felony.
> 2. When a felony has been in fact committed and he has reasonable ground to believe that the person to be arrested has committed it.

Because the suspected crime that the bank reported to police had not in fact been committed, the statute affords no privilege to the bank to arrest Deadman, to instigate his arrest by officers, or to participate in that arrest.

■ Moreover, in spite of the trial judge's remarks on granting a directed verdict for Deadman, strictly speaking, the question of probable cause is of no consequence in an action against a private citizen for false arrest. *See* § 45A, comment d; *see also Reicheneder v. Skaggs Drug Center*, 421 F.2d 307 (5th Cir.1970). Because no crime had been committed, the bank's liability depends solely on whether it either instigated or participated in Deadman's arrest.

We also disagree with the bank's assertion that, on this record, the bank neither instigated nor participated in the arrest as a matter of law. The trial court may direct a verdict for one party only where no evidence has been introduced that would justify a reasonable person in returning a verdict for the opposing party. *Rocky Mountain Fire & Cas. Co. v. Biddulph Oldsmobile*, 131 Ariz. 289, 640 P.2d 851 (1982); *Kuhnke v. Textron, Inc.*, 140 Ariz. 587, 684 P.2d 159 (App.1984). As long as reasonable minds can differ over the conclusions to be drawn from the evidence, a directed verdict is unwarranted. *Dietz v. Waller*, 141 Ariz. 107, 685 P.2d 744 (1984); *Chambers v. Western Arizona CATV*, 130 Ariz. 605, 638 P.2d 219 (1981).

■ A defendant may be held liable as the instigator of an arrest, even though there is no evidence that he expressly requested or demanded it, as long as the facts surrounding the arrest reasonably create a permissible inference of instigation. *Crescent Amusement Co. v. Scott*, 34 Ala.App. 335, 40 So.2d 882 (1949). The court states in *Knupp v. Esslinger*, 363 S.W.2d 210 (Mo.Ct.App.1962):

> It is thoroughly settled law that a person is liable for a false arrest made by another if he "directed, advised, countenanced, encouraged, or instigated" such arrest. *Snider v. Wimberly*, 357 Mo. 491, 209 S.W.2d 239 [ (1948) ]. In order to establish a case of false arrest it is not necessary that plaintiff prove that defendant actually ordered or directed his arrest, but he may make his case by showing that defendant merely instigated it. "Furthermore, such fact may be shown either by direct or by circumstantial evidence." *Thompson v. Fehlig Bros. Box & Lumber Co. et al.*, Mo.App. 155 S.W.2d 279 [ (1941) ], and cases cited.

363 S.W.2d at 213; *see also Jillson v. Caprio*, 181 F.2d 523 (D.C.Cir.1950).

The parties have not cited, nor has our own research revealed, any Arizona decision that illustrates the application of these principles. However, courts in many other jurisdictions have confronted questions similar to the one before us. For example,

in *Thurman v. Cundiff,* 2 Kan.App.2d 406, 580 P.2d 893 (1978), the plaintiff leased from the defendant's mother a large parcel of farming property, exclusive of the lessor's residence. A running dispute developed between the plaintiff and defendant's mother over whether the plaintiff was entitled to use a particular driveway in order to gain access to the leased property. Defendant was alone in charge of the premises on the day of the incident that gave rise to plaintiff's claim for false arrest. After the defendant had refused to unlock a gate in order to allow the plaintiff access to the disputed driveway, the plaintiff unfastened several strands of barbed wire in the fence next to the gate and proceeded down the driveway, allegedly veering toward the defendant at one point. The defendant called sheriff's deputies. The court summarized the evidence:

> There is evidence that Bob Cundiff [defendant] told one deputy the plaintiff had taken down or cut "our fence" and had driven down "our private drive" after being told to stay out. Bob Cundiff testified he told a deputy, "That man came right at me and veered off" and he asked the deputy, "What can we do about it ..." A deputy testified that he was told by Bob Cundiff that plaintiff had destroyed Bob Cundiff's wire. Plaintiff observed Bob Cundiff engaging in an animated conversation with a deputy and pointing at the plaintiff just prior to the arrest. After talking with Bob Cundiff, one of the deputies accused plaintiff of having cut the fence and intruding. There is no evidence in the record that Bob Cundiff at any time attempted to explain to the sheriff's deputies that plaintiff was his mother's lessee.

580 P.2d at 898. The deputies took the plaintiff into custody while they made telephone calls in an effort to get more facts on the case, but no charges were ever filed against him. The plaintiff prevailed in his suit for false arrest. In affirming the judgment on appeal, the court stated:

> One seeking to recover for false arrest must prove he was unlawfully caused to be arrested by the defendant and, though it is not necessary that the arrest be directly ordered by the defendant, it must appear that the defendant either instigated it, assisted in it, or by some means directed or encouraged it. [Citations omitted.] As to what constitutes direction or instigation of an arrest so as to render a defendant liable for false arrest, 32 Am.Jur.2d, False Imprisonment, § 35, says in part:
>
>> "What is direction or instigation sufficient to impose liability on a private citizen for a wrongful arrest made by an officer, within the rule imposing liability on a citizen at whose request or instigation an arrest is made without a warrant, depends on the facts of each case. It is not necessary, to impose liability, that the defendant expressly direct the arrest. Nor need he be present when the arrest is actually made. However, he must take some active part in bringing the arrest about—that is, there must be some affirmative act on his part which induces the officer to make the arrest...." (pp. 98–99.)

580 P.2d at 897.

The court rejected the defendant son's argument that all he had done was to supply the deputies with information about a supposed offense and that the deputies had conducted their own independent investigation before making an arrest. The court held that the jury could reasonably have found otherwise. It noted that although the evidence did not establish that the defendant had expressly directed the deputies to arrest the plaintiff, there was substantial circumstantial evidence that the defendant had instigated the arrest.

Similarly, in *Aldridge v. Fox,* 348 Ill.App. 96, 108 N.E.2d 139 (1952), Montgomery Ward sold portable radios designed for use with unique detachable electrical cords obtainable only at Ward's. Six of these radios were stolen from a Ward's store without electrical cords. The police told the store to notify them if anyone suspicious attempted to buy such a cord. It later happened that the plaintiff, who had received such a radio as a gift, went to Ward's and attempted to buy a cord for it. The appli-

ances manager induced the plaintiff to remain in the store on a pretext and called the police. When officers arrived, the manager pointed plaintiff out, saying, "There is your man." The police took plaintiff into custody, but he was later released and exonerated. In the plaintiff's suit for false arrest, the court rejected the store's argument that it was the police who had falsely imprisoned the plaintiff, holding that the manager had been the cause of the plaintiff's arrest.

█ In the instant case, the record contains substantial evidence from which a jury could reasonably conclude that the bank, through its employees, either instigated or participated in Deadman's arrest. First, although there was no evidence that the bank expressly directed the officers to arrest Deadman, there was substantial circumstantial evidence from which a jury could reasonably conclude that the bank's conduct amounted to more than merely providing information. The bank's communication to police included a request that police officers come to the branch as quickly as possible, leading the police dispatcher to interpret the call as reporting a "forgery in progress." Furthermore, the record discloses no independent investigation by police before arresting Deadman; the officers apparently relied on the bank's ostensible expertise in detecting forgeries.

In addition, Barrett actively undertook to stall Deadman so that he might remain in the branch long enough to be apprehended. Barrett pointed Deadman out to the officers by nodding toward him, and when the officers had taken Deadman into custody, Deadman heard Barrett say something like, "We finally caught him." In our opinion, the trial court did not err in denying the bank's motion for directed verdict on Deadman's claim for false arrest or false imprisonment.

The authorities upon which the bank relies do not require a contrary conclusion. First, the bank refers us to several cases in which a crime had actually been committed,

and the defendant had mistakenly identified the plaintiff as the guilty party. In *Turner v. Mellon,* 41 Cal.2d 45, 257 P.2d 15 (1953), for example, the court concluded that the defendant could not be held liable for misidentifying the plaintiff as the man who had robbed him four times. The court stated:

> All that Mellon did here was to report the commission of the crimes and state to the police officers his honest but mistaken opinion that plaintiff was the robber. This conduct did not in law amount to taking "some active part in bringing about the unlawful arrest," and since Mellon did not participate in the false imprisonment neither he nor his employer ... is liable therefor.

41 Cal.2d at 48, 257 P.2d at 17. *See also Smith v. District of Columbia,* 399 A.2d 213 (D.C.1979).

In the instant case, the bank suggests that a crime had indeed been committed: several attempts to obtain $2,000 cash advances had been made at sister branches within the week preceding the Deadman incident. It is apparent, however, from the testimony of the bank's employees, that they called the police to report a suspected crime then in progress. The facts of this case are inconsistent with mere misidentification of Deadman as the person who had made the previous attempts.[1]

*Odorizzi v. A.O. Smith Corp.,* 452 F.2d 229 (7th Cir.1971), is also distinguishable. In that case, the defendant employer passed on to police the results of a private investigation concerning employee involvement in the theft of some payroll checks. The plaintiff was one of a small number of employees upon whom suspicion had been focused. In affirming a judgment n.o.v. for the defense, the court stated:

> Defendants did not command the police to arrest plaintiff, nor did they identify plaintiff as the thief. They did not campaign to have the plaintiff accused of the alleged crime, since they considered at least thirteen other employees as possi-

---

1. Were this a legitimate case of misidentification, the bank might avoid liability, under A.R.S. § 13–3884(2), upon proof that its employees had reasonable ground to believe that Deadman was the person who had made previous attempts at other bank branches.

ble suspects. The police did not rely on accusations by defendants, because the officers were conducting an independent investigation which pointed to the plaintiff.

452 F.2d at 232. *Odorizzi* is hardly on point. *See also Johnson v. First Nat'l Bank,* 207 Neb. 521, 300 N.W.2d 10 (1980) (bank did not procure plaintiff's arrest merely by providing information to proper authorities).

*Brown v. Far West Fed. Sav. & Loan Ass'n,* 66 Or.App. 387, 674 P.2d 1183 (1984) is also inapposite. In that case, the defendant savings and loan association had reported to the police that the plaintiff had presented a withdrawal slip bearing the message, "This is a holdup." The plaintiff sued in the trial court for false imprisonment, as well as on theories of negligence and battery, and the trial court granted a directed verdict for the defense on all counts. However, the plaintiff did not argue the false imprisonment claim on appeal, and the court concluded that he had abandoned it. The court held that in the context of the plaintiff's *negligence* claim, the defendant savings and loan association had no affirmative duty either to investigate further before requesting police assistance or to report to the police that the plaintiff was a legitimate customer who had just withdrawn $11,000 from his account.

However, we have examined with interest another case cited by the bank. In *Pokorny v. First Fed. Sav. & Loan Ass'n,* 382 So.2d 678 (Fla.1980), Pokorny, a deaf-mute, approached a teller in order to obtain a coin bag. He handed the teller a note that said, *"Please* give me *zipper bag."* The teller became convinced that Pokorny was attempting a robbery when he repeatedly pointed at the note and at the cash drawer. Pokorny eventually walked out with an empty zipper bag, and First Federal immediately telephoned the authorities to report that an attempted robbery had taken place.

Pokorny and his companions were arrested and released; no charges were filed against them. They sued First Federal in federal district court for false arrest. The jury returned a defense verdict, having been instructed that the bank was not to be found liable if the teller had, in light of the facts then available to her, acted reasonably in believing that Pokorny was attempting a robbery. On appeal, several questions were certified to the Florida Supreme Court, which held that:

> [U]nder Florida law, a private citizen may not be held liable in tort where he neither actually detained another nor instigated the other's arrest by law enforcement officers. If the private citizen makes an honest, good faith mistake in reporting an incident, the mere fact that his communication to an officer may have caused the victim's arrest does not make him liable when he did not in fact request any detention.
>
> ... As long as the employees acted reasonably, their action did not constitute "direct procurement of an arrest"....

382 So.2d at 682 (citations omitted).

■ We agree, in part, with the rationale in *Pokorny* because it seems to strike a balance between two compelling and competing interests: although strong public policy favors encouraging private citizens to report suspected criminal activity, the falsely and unreasonably accused individual ought not to be without a legal remedy. We hold, therefore, that a private citizen who does not expressly request the detention of another does not "instigate" an arrest, so long as his actions were reasonable in light of the facts then known or readily available to him.

In so holding, we stress that the focus of the inquiry must be on the reasonableness of the defendant's *conduct.* We disagree with *Pokorny* insofar as it implies that a private citizen's reasonable belief that a crime has been committed constitutes a defense to false arrest—it does not, although the reasonableness of the defendant's *belief* will no doubt bear on the reasonableness of his *conduct.* This conduct must be measured against how a reasonable person, considering all of the facts and circumstances, would go about reporting possible criminal activity. What is "rea-

sonable" will vary according to such factors as the nature and seriousness of the crime suspected, the possible danger to a specific victim or to the public if the suspect is not apprehended immediately, and the existence of alternative means for ensuring that the suspected criminal is eventually brought to justice.

 We conclude that denial of the bank's motion for a directed verdict was proper because the record contains evidence upon which a jury might reasonably find that the bank's employees (1) engaged in conduct that directly resulted in Deadman's arrest, and, that in doing so, they did not act "reasonably" under the circumstances, or (2) that they in fact participated in the arrest.

### SUA SPONTE DIRECTED VERDICT IN FAVOR OF DEADMAN

 The bank next contends that the trial court erred in directing a verdict in favor of Deadman because whether Deadman had proved the necessary elements for a claim for false arrest was a question of fact for the jury to determine. We agree. Our holding that, on this evidence, a jury might reasonably have found that the bank instigated or participated in Deadman's arrest does not compel the conclusion that no reasonable jury could have found otherwise. Contrary to Deadman's argument, this is not a case in which the facts are such that reasonable minds could draw only one conclusion or inference from them.

First, rather than conclude that the bank's employees "persuaded or encouraged" police to arrest Deadman, a jury might reasonably find that the bank merely gave information to the police, however conclusory or erroneous, and that the officers' decision to take Deadman into custody resulted more from their own professional views about how a suspect should be handled in an open public area than from the nature of the report made by bank employees. Second, a jury might conclude that the conduct of the bank's employees was insufficient to constitute participation in the arrest. Finally, a jury might con-

clude that, based on the information then available to the bank, its employees acted reasonably in reporting suspected criminal activity to the police. We realize that on this latter point, we are indulging the bank to the limit. We do so only because we believe that it would not be good policy to discourage people who honestly believe that a crime is being committed from reporting their observations to the police.

Because of our disposition of this appeal, we need not consider the bank's contention that the trial court abused its discretion in denying the bank's motion for a new trial or judgment notwithstanding the verdict.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

KLEINSCHMIDT, P.J., and SHELLEY, J., concur.